107 P.3d 900

**STATE of Arizona, Appellee,**

v.

**Albert Martinez CARREON, Appellant.**

**No. CR–03–0160–AP.**

Supreme Court of Arizona,
En Banc.

Feb. 24, 2005.

58

Terry Goddard, Attorney General, by Kent E. Cattani, Chief Counsel, Capital Litigation Section, and Dawn M. Northup, Assistant Attorney General, Phoenix, Attorneys for the State of Arizona.

Maricopa County Public Defender, by Brent E. Graham, Deputy Public Defender,

and Karen M. Noble, Deputy Public Defender, Phoenix, Attorneys for Albert Martinez Carreon.

## OPINION

McGREGOR, Vice Chief Justice.

¶ 1 Albert Martinez Carreon was indicted for first-degree murder, attempted first-degree murder, burglary in the first degree, two counts of endangerment, and misconduct involving weapons. All charges arose out of the murder for hire of Armando Hernandez and the attempted murder of Hernandez' girlfriend, Cristina Aragon. Following a trial, the jury found Carreon guilty of all counts charged.

¶ 2 In the aggravation phase of Carreon's trial, the jury found the following statutory aggravators beyond a reasonable doubt: that Carreon had previously been convicted of a serious offense, Arizona Revised Statutes (A.R.S.) § 13–703.F.2 (Supp.2004); that in the commission of his current offense, Carreon had knowingly created a grave risk of death to another person or persons in addition to the person murdered, A.R.S. § 13–703.F.3; that Carreon had committed the offense in consideration for or in expectation of the receipt of something of pecuniary value, A.R.S. § 13–703.F.5; and that Carreon had committed the offense while in the custody of, or on authorized release from, the state department of corrections, A.R.S. § 13–703.F.7(a).

¶ 3 Following the penalty phase, the jury sentenced Carreon to death on count one, murder in the first degree. The trial court entered the sentence of death on that count and sentenced Carreon to aggravated prison terms on the non-capital charges. On May 1, 2003, the clerk of the court filed an automatic notice of appeal on Carreon's behalf. We have jurisdiction pursuant to Article 6, Section 5(3) of the Arizona Constitution, A.R.S. Section 13–4031, and Arizona Rule of Criminal Procedure 31.2.b.

## I.

¶ 4 Cristina Aragon and Armando Hernandez began dating in 2000. Eventually, Hernandez moved into Aragon's apartment, where she lived with her two sons. Shortly after Aragon and Hernandez began dating, Aragon met with two other acquaintances, Bobby Palofax and Richard Trujillo.

¶ 5 Trujillo and Palofax told Aragon that Hernandez was the "snitch" responsible for the arrest and incarceration of Frank, Richard Trujillo's brother. Trujillo and Palofax asked Aragon to gather information about Hernandez. Afraid she might be harmed if she refused, Aragon agreed to help.

¶ 6 Aragon told Hernandez of her conversation with Palofax and Trujillo. Aragon and Hernandez then changed apartments and telephone numbers and Aragon stopped associating with Palofax and the Trujillos.

¶ 7 Hernandez later introduced Aragon to his friend "Longo," with whom he had been incarcerated. Aragon first met Longo in person on Thanksgiving Day of 2000, when he came to the apartment she and Hernandez shared.

¶ 8 On January 22, 2001, Longo came to Aragon and Hernandez' apartment around 8:00 p.m. While Aragon readied her sons for bed, Longo spoke with Hernandez and asked to borrow $100.00 to help with his rent. Longo left sometime after 9:00 p.m.

¶ 9 Around 9:30 p.m. the next night, January 23, 2001, Aragon heard a pounding on the apartment's front door. She awakened Hernandez, who went to the door with Aragon's pistol. When Hernandez saw that the visitor was Longo, he gave the pistol to Aragon. Hernandez let Longo in, and Aragon went back to bed while Hernandez and Longo talked. A few minutes later, Hernandez called Aragon, asked her to get Longo a glass of water, and told her that Longo wanted to talk to her. Although Longo told Aragon that Palofax was upset with her, Aragon told Longo she would not do anything to hurt Hernandez.

¶ 10 Longo then went into the bathroom. He came out wiping his cell phone with a tissue and said he had dropped it in the toilet. He went back into the bathroom and emerged for the second time, now with a pistol in his hand. He walked to Hernandez, who was seated in a recliner, and shot him through the thigh. As Hernandez fell face forward, Longo shot him in the head, killing him.

¶ 11 When Aragon screamed and tried to run, Longo shot her in the abdomen. Aragon fell, got up, and ran toward the bedroom where her boys slept. Longo then shot her in the neck. Aragon took a few more steps, and Longo shot her in the face. Aragon collapsed outside her sons' bedroom and screamed for help.

¶ 12 Longo ran out the front door. Aragon continued to shout until Longo reappeared, apparently drawn by her cries. He stepped over to her and struck her over the head with a hard object. Aragon then feigned death until Longo left. When he had, she called to her sons. Her oldest retrieved a cell phone and Aragon called 911. Aragon told the operator that she did not know the name of the person who shot her. Nonetheless, she described her assailant as a friend of her boyfriend, tall, dark, wearing a blue cap, tan pants, and a long black jacket. She described his car as small and silver with a white top.

¶ 13 When the police arrived, Aragon told officers that her boyfriend's friend had shot her and all she knew was the name "Longo." At the hospital, Aragon reiterated to a detective that Longo had shot her. When police officers showed Aragon a photographic lineup, she identified Carreon as Longo.[1] Aragon also testified that Longo had a spider web tattoo on his left hand. Carreon has such a tattoo.

¶ 14 Investigators recovered an expended bullet from the doorframe of Aragon's sons' bedroom. Other expended bullets were recovered, including one from Hernandez' head. A criminalist later testified that all of the recovered bullets were fired from the same gun and that Aragon's pistol did not fire the bullets. The gun that fired the bullets was never recovered. Police also lifted Carreon's fingerprints from a glass on the coffee table in Aragon's living room.

¶ 15 On January 24, 2001, police arrived at Richard Trujillo's home. Trujillo was standing in the front yard talking to a male who matched Carreon's description. That male then entered a vehicle that matched Aragon's description of Carreon's car. The police stopped and arrested Carreon, who had $1005.22 in his wallet when arrested.

¶ 16 Carreon raises multiple issues on appeal. We consider each in turn.

## II.

### A.

¶ 17 Carreon asserts that retroactive application of Arizona's new death penalty statute violates the Ex Post Facto Clauses of the state and federal constitutions, U.S. Const. Art. I § 10, cl. 1 and Ariz. Const. Art. 2, Section 25, as well as A.R.S. § 1–244 (2002), our statutory prohibition against retroactive application of statutes. We disagree.

¶ 18 In *Ring v. Arizona*, 536 U.S. 584, 589, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002) (*Ring II* ), the United States Supreme Court held that "[c]apital defendants, no less than noncapital defendants ... are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment." Having so held, the Court concluded that Arizona's then-existing capital sentencing scheme violated a defendant's Sixth Amendment right to a jury trial by allowing a judge rather than a jury to find the facts that made a defendant eligible for a capital sentence. *Id.* at 608–09, 122 S.Ct. 2428.

¶ 19 On the heels of that decision, Arizona's legislature amended the state's capital sentencing procedures. Under the new procedures, the jury that serves at the guilt phase of a capital trial also serves as the finder of fact at the defendant's aggravation and penalty phases. A.R.S. § 13–703.01.C & D. (Supp.2004).

¶ 20 We have already held that this new sentencing scheme does not violate the federal or state Ex Post Facto Clause. In *State v. Ring*, 204 Ariz. 534, 547 ¶ 24, 65 P.3d 915, 928 (2003) (*Ring III* ), we reasoned that "Arizona's change in the statutory method for imposing capital punishment is clearly procedural" and thus this change "does not affect the substantive matters of the defendant's prosecutions." Based on that determination, we then held that "applying the new sentenc-

---

1. Carreon has "East Side Longo" tattooed on his back in capital letters.

ing statutes does not violate the federal or state Ex Post Facto Clause." *Id.*

¶ 21 The United States Supreme Court reached the same conclusion in *Schriro v. Summerlin,* 542 U.S. 348, 124 S.Ct. 2519, 159 L.Ed.2d 442 (2004). There, the Court considered whether its previous decision in *Ring II* applied retroactively to cases already final on direct review. Concluding that it does not, the Court held that *Ring II* announced a new procedural, rather than a substantive, rule. *Id.* at ——, 124 S.Ct. at 2523. The Court stated:

> *Ring [II]* held that "a sentencing judge, sitting without a jury, [may not] find an aggravating circumstance necessary for imposition of the death penalty." Rather, "the Sixth Amendment requires that [those circumstances] be found by a jury." This holding did not alter the range of conduct Arizona law subjected to the death penalty. It could not have; it rested entirely on the Sixth Amendment's jury-trial guarantee, a provision that has nothing to do with the range of conduct a State may criminalize. Instead, *Ring [II]* altered the range of permissible methods for determining whether a defendant's conduct is punishable by death, requiring that a jury rather than a judge find the essential facts bearing on punishment. Rules that allocate decisionmaking authority in this fashion are prototypical procedural rules. . . .

*Id.* (quoting *Ring II,* 536 U.S. at 609, 122 S.Ct. 2428).

¶ 22 Because *Ring II* announced a new procedural rule, application of the new statute to Carreon does not violate either the federal or state Ex Post Facto Clause.

### B.

¶ 23 On August 6, 2002, more than six months after Carreon's indictment, the State filed a notice setting forth four aggravating factors the State would seek to prove if Carreon were convicted of first-degree murder. The trial court denied Carreon's motion demanding either a remand to the grand jury for a finding on those aggravators or, alternatively, dismissal of the aggravating factors.

¶ 24 Carreon asserts that permitting the State to amend his indictment to include aggravating factors violated his rights under the federal and state constitutions. To buttress his argument, Carreon relies primarily on *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), and *Ring II.*

¶ 25 We recently rejected this argument in *McKaney v. Foreman,* 209 Ariz. 268, 100 P.3d 18 (2004), in which we held that aggravators need not be alleged in an indictment. *McKaney,* 209 Ariz. at 273 ¶ 23, 100 P.3d at 23. Arizona's method for providing notice to defendants of the aggravating factors that the state will seek to prove at sentencing violates neither the Arizona nor federal constitutional right to a jury trial.

### C.

¶ 26 Carreon also asserts that he was denied a fair trial and due process of law when the trial court excluded for cause potential jurors who had general objections to the death penalty. Under the facts of this case, we disagree.

¶ 27 As Arizona Rule of Criminal Procedure 18.5.d specifically allows, the trial judge elected to use written jury questionnaires to assist in jury selection. One hundred fifty-two potential jurors turned in questionnaires. Before oral questioning, the judge reviewed the questionnaires, paying special attention to each potential juror's availability and general views on the death penalty. The judge then presented to counsel his list of jurors that "will probably need to be stricken or at least there's a question about them." The court asked counsel to come to an agreement regarding which jurors should be excused.

¶ 28 The next day, the parties met to review the completed questionnaires and to decide which jurors the court should strike for cause prior to voir dire. After the court struck some jurors pursuant to counsels' stipulations, the State moved to strike additional jurors for cause based on their objections to the death penalty. Over defense objection, the court granted the State's motion to exclude some jurors based upon each juror's written answers to questions regarding the death penalty.

¶ 29 Carreon urges that the trial court abused its discretion by excluding jurors who

expressed general objections to the death penalty before those jurors could be orally questioned. In particular, Carreon maintains that although jurors 102, 131, and 138 expressed a moral repugnance to the death penalty, "each of them also answered that regardless of their personal views they could follow the instructions and law as given to them by the court."

¶ 30 We agree with Carreon that, in general, the "clear language and intent of [Arizona Rule of Criminal Procedure 18.5.d] is that each party be given opportunity and reasonable time to question prospective jurors to discover information relevant to challenges and to possibly rehabilitate them." *State v. Anderson*, 197 Ariz. 314, 321 ¶ 14, 4 P.3d 369, 376 (2000). In this case, as in *Anderson*, the trial judge excluded three prospective jurors for cause prior to voir dire. As occurred in *Anderson*, each prospective juror had indicated moral qualms about the death penalty, but each had also indicated that he or she would set aside personal belief to follow the law. The unique facts of this case, however, distinguish it from *Anderson*.

¶ 31 At the start of jury selection, the trial court divided the prospective jurors into panels of sixty. By stipulation of the lawyers, the judge then excused a substantial number of potential jurors. As only a total of thirty-six jurors were needed for the parties to exercise their strikes, seat a jury, and allow for alternates, the trial court decided that if all thirty-six could be drawn from the first group of sixty, no further jurors would be called for voir dire. The court called the first sixty jurors, which included those initially designated as jurors 1 through 94. The parties exercised their strikes and then selected a jury and alternates from the remaining prospective jurors.

¶ 32 Carreon claims the court committed *Anderson* error by excluding jurors 102, 131, and 138. Because the parties selected the jury from numbers 1 through 94, however, the potential jurors on whose excusal Carreon bases his claim of error never would

have been called for voir dire and never would have served on Carreon's jury. Under these facts, any *Anderson* error was harmless.

**D.**

¶ 33 The only witness to the murder was Cristina Aragon, a woman who barely escaped being killed herself. At trial, Aragon identified Carreon as the person who killed Hernandez and attacked her. Carreon's primary defense was that Aragon had misidentified him. In support of this defense, Carreon attempted to obtain police reports regarding the homicides of Jesse Garcia and Morris Torres. Carreon argued that evidence about the murders was relevant to impeach Aragon and to show her relationship with Richard Trujillo and Robert Palofax.[2] After the State objected on relevance grounds, the trial judge reviewed the reports *in camera*. Although the court excluded the evidence, finding that the probative value of the evidence was outweighed by the danger of jury confusion, the court stated that it would revisit its decision if the evidence later proved relevant to Aragon's credibility.[3]

¶ 34 Following the court's decision, the State moved *in limine* to preclude reference at trial to any mention of several aspects of Hernandez' criminal record, including the nature of the charges for which he previously had been imprisoned and any reference to a prison stabbing involving Hernandez. The State also moved to preclude any mention of the deaths of Jesse Garcia and Morris Torres as irrelevant. Carreon did not respond to the motion but did object to the preclusion of any reference to the Torres and Garcia murders.

¶ 35 Carreon argues that the trial court's decisions denying disclosure of the police report related to the death of Jesse Garcia and granting the State's motion to preclude references to the Garcia and Torres murders de-

---

2. Members of the Trujillo crime family allegedly murdered Torres and Garcia. According to Carreon's theory, Aragon knew of both murders before they happened and was instrumental in at least one of the killings.

3. During Aragon's cross-examination, Carreon attempted to introduce evidence of the Torres and Garcia murders. The State objected. The trial court again ruled that Carreon could not raise this subject because it "would mislead the jury and confuse the issue."

nied him the right to effectively cross-examine Aragon in violation of the United States Constitution's Confrontation Clause. We disagree.

¶ 36 The Sixth Amendment guarantees a criminal defendant the right "to be confronted with the witnesses against him." U.S. Const. amend. VI. As the United States Supreme Court has held, the "main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination." *Davis v. Alaska*, 415 U.S. 308, 315–16, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974) (citation omitted). This right, however, is not without boundary, and trial judges "retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on ... cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *State v. Cañez*, 202 Ariz. 133, 153 ¶ 62, 42 P.3d 564, 584 (2002) (citation omitted).

¶ 37 The trial court did not abuse its discretion in precluding this line of evidence. Introducing information about two unrelated murders could well have confused the jury. Additionally, Carreon has not shown that he was prejudiced by its omission. Although Carreon argues that Aragon's knowledge and connection to Trujillo's criminal organization were relevant to her credibility, Carreon in fact introduced other evidence related to these issues. We find no abuse of discretion.

### E.

¶ 38 The jury convicted Carreon of two counts of endangerment.[4] The victims of these crimes were Aragon's two small sons, who were asleep in their room while the attacks on Hernandez and Aragon took place in the adjacent living room. At the conclusion of the State's case, the trial court denied Carreon's motion for a directed verdict on these counts.

¶ 39 Carreon challenges these convictions on the ground that he neither acted "recklessly," as required by statute, nor placed Aragon's boys in *actual* substantial

risk of imminent death. A person acts "recklessly" when the "person is aware of and consciously disregards a substantial and unjustifiable risk." A.R.S. § 13–105.9(c) (2001). The court of appeals has held that a defendant places a person in "substantial risk" if he places the victim "in *actual* substantial risk of imminent death." *State v. Doss*, 192 Ariz. 408, 411 ¶ 10, 966 P.2d 1012, 1015 (App. 1998) (emphasis added); *State v. Morgan*, 128 Ariz. 362, 367, 625 P.2d 951, 956 (App. 1981).

¶ 40 Carreon first contends that the State presented no evidence that he was aware of and consciously disregarded a substantial risk of harm. Specifically, Carreon argues that he had no idea that Aragon's children were present in the apartment on the night of the murder.

¶ 41 The State presented sufficient evidence at trial to justify the jury's conclusion that Carreon was aware of and disregarded a substantial risk to the children. Aragon testified that Carreon visited Aragon's apartment the night before the killing. She stated that when Carreon came over, her boys were "getting ready for bed, taking a bath, shower, everything." Aragon further testified that when Carreon came over that night the "kids were still up. They were still running around getting ready for bed." According to Aragon, while Carreon was present, she put the boys to bed in their bedroom and closed their door. This evidence permitted the jury to draw the inference that Carreon knew Aragon's two boys were present when he started shooting the following night.

¶ 42 Likewise, the State presented sufficient evidence for the jury to conclude that Carreon placed the children in actual substantial risk of imminent death. The boys' bedroom shared a thin common wall with the living room, and its door was within close proximity to the place Aragon collapsed. The evidence established that the boys were in their bedroom at the time of the shooting. In addition, police recovered a bullet from the doorjamb of the boys' bedroom. Based on these facts, the jury could find that Carreon placed Aragon's children in actual sub-

---

4. "A person commits endangerment by recklessly endangering another person with a substantial risk of imminent death or physical injury." A.R.S. § 13–1201.A (2001).

stantial risk of imminent death or physical injury.

¶ 43 Because sufficient evidence shows that Carreon knew both that Aragon's boys lived in the apartment and that his actions placed them in actual substantial risk of imminent death, it was not error for the jury to convict him of endangerment. We affirm his convictions on these counts.

## F.

¶ 44 Carreon was also charged with misconduct involving weapons because he was a prohibited possessor on the day of the shootings.[5] At trial, the parties stipulated that "the defendant was a prohibited possessor of weapons to include firearms on January 23rd 2001." After confirming the accuracy of the stipulation, the court stated to the jury:

> Ladies and gentlemen, the attorneys have stipulated that the defendant was, in fact, a prohibited possessor of firearms on January 23rd of 2001. That fact should be considered by you as fact during your deliberations. That is also one of the elements on the charge of misconduct involving weapons. *So, pursuant to the stipulation of the parties, that element has been satisfied for purposes of your deliberations.* (Emphasis added.)

¶ 45 Although Carreon did not object to this instruction at trial, he maintains that the trial court's statement commented on the evidence and constituted fundamental error.[6] Relying primarily on *United States v. Muse*, 83 F.3d 672 (4th Cir.1996), Carreon contends that a guilty verdict is "not valid unless a *jury* considers the stipulation and returns a guilty verdict based on its finding that the government proved the elements of the crime beyond a reasonable doubt." *Id.* at 679–80 (emphasis in original).

¶ 46 As Carreon asserts, "convictions [must] rest upon a jury determination that the defendant is guilty of every element of the crime with which he is charged, be-

yond a reasonable doubt." *United States v. Gaudin*, 515 U.S. 506, 510, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995). Therefore, "a trial judge is prohibited from entering a judgment of conviction or directing the jury to come forward with such a verdict, regardless of how overwhelmingly the evidence may point in that direction." *United States v. Martin Linen Supply Co.*, 430 U.S. 564, 572–73, 97 S.Ct. 1349, 51 L.Ed.2d 642 (1977) (citations omitted).

¶ 47 The judge should not have instructed the jury that the stipulation satisfied the State's burden of proving an element of the crime. But in the absence of an objection at trial, such error does not justify reversal unless the error goes to the very foundation of Carreon's theory of the case. Here, Carreon stipulated to the fact that he was a prohibited possessor on January 23, 2001, and presented no argument to contradict that fact.

¶ 48 In addition, the final jury instructions correctly defined the effect of a stipulation. The instruction as to stipulations stated: "The lawyers are permitted to stipulate that certain facts exist. This means that both sides agree those facts do exist and are part of the evidence." The final instruction for the crime involving prohibited possession of a weapon required the jury to find "proof of the following three things: 1. The defendant possessed a deadly weapon; *and* 2. The defendant was a prohibited possessor, *and* 3. The defendant acted knowingly." Through these instructions, the judge properly instructed the jury of the findings needed to conclude that Carreon was a prohibited possessor. No fundamental error occurred.

## G.

¶ 49 Carreon challenges the jury's findings of the statutory aggravators making him eligible for a sentence of death on several grounds. The aggravating factors found by the jury included that Carreon had been previously convicted of a serious crime,[7] that

---

**5.** "A person commits misconduct involving weapons by knowingly: ... 4. Possessing a deadly weapon if such person is a prohibited possessor." A.R.S. § 13–3102.A.4 (2001).

**6.** Fundamental error is error that deprives a defendant of a right essential to his defense and

of a fair trial, or error that goes to the very foundation of the defendant's theory of the case. *State v. Valenzuela*, 194 Ariz. 404, 407 ¶ 15, 984 P.2d 12, 15 (1999).

**7.** A.R.S. § 13–703.F.2 (Supp.2004).

he committed the offense for pecuniary gain,[8] that he knowingly created a grave risk of death to another person or persons,[9] and that he committed the offense while in the custody of, or on authorized or unauthorized release from, the state department of corrections.[10]

¶ 50 Under Arizona's statutes, the trier of fact shall impose a sentence of death if it finds one or more statutory aggravating factors and determines that there are no sufficiently substantial mitigating circumstances to call for leniency. A.R.S. § 13–703.E. The jury in Carreon's case followed this procedure and imposed a sentence of death. This court independently reviews the jury's findings of whether a death sentence is warranted. A.R.S. § 13–703.04.A.[11]

### H.

#### 1.

¶ 51 The State alleged, among other aggravators, that the "defendant was previously convicted of a serious offense." A.R.S. § 13–703.F.2. In support of that aggravator, the State offered evidence that "Albert Martinez Carreon" had previously been sentenced to prison for fourteen years for kidnapping and fifteen years for aggravated assault. Defense counsel stipulated to the introduction of this evidence, and the State offered no further evidence in support.

¶ 52 After deliberation, the jury found the F.2 factor established beyond a reasonable doubt. Carreon now argues that insufficient evidence supports this aggravator.

¶ 53 The state meets its burden of proving a prior conviction by offering into

8. A.R.S. § 13–703.F.5.

9. A.R.S. § 13–703.F.3.

10. A.R.S. § 13–703.F.7(a).

11. Arizona's capital sentencing scheme was declared unconstitutional by the United States Supreme Court in *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). In response, Arizona revised its capital sentencing scheme.

We review Carreon's sentence under A.R.S. § 13–703.04 because his crime occurred before the effective date of the new statute while his sentencing was held after its effective date. As the session law makes clear:

evidence a certified copy of a defendant's prior conviction and establishing that the defendant is the person to whom the document refers. *State v. Marlow*, 163 Ariz. 65, 70, 786 P.2d 395, 400 (1989); *State v. Hauss*, 140 Ariz. 230, 231, 681 P.2d 382, 383 (1984).

¶ 54 The documentation admitted into evidence through stipulation provided a sufficient basis for the jury to find, beyond a reasonable doubt, the existence of Carreon's prior convictions. The documentation also provided a sufficient basis to identify Carreon as the person referred to in the documents.[12] Thus, sufficient evidence existed for a jury to find, beyond a reasonable doubt, the existence of Carreon's convictions and that he was the person referenced in those records of convictions.

¶ 55 Carreon also argues that he was denied a unanimous verdict on the F.2 factor. In support of the F.2 aggravator, the State presented evidence that Carreon had been convicted of both kidnapping and aggravated assault. These convictions arose from the same criminal transaction. The judge instructed the jury that: "A serious offense means any of the following offenses: one, kidnapping, two, aggravated assault, a dangerous offense." Carreon posits that some jurors might have found him previously convicted of kidnapping, while others might have found him previously convicted of aggravated assault. Because the jurors did not specify which of the two serious offenses it relied upon to establish the F.2 factor, Carreon alleges that he was denied a unanimous verdict on that aggravator in violation of Article 2, Section 23 of the Arizona Constitution.

Section 13–703.04, Arizona Revised Statutes, as renumbered by this act, applies to any sentencing or resentencing proceeding on any first degree murder case that is held after the effective date of this act and in which the offense was committed before the effective date of this act.

Laws 2002, 5th Spec. Sess., Ch. 1 § 7, subsec. B.

12. Documents from the Arizona Department of Corrections provide a detailed physical description of Carreon, including the fact that Carreon has a tattoo across his back reading "East Side Longo." Carreon was identified several times as "Longo" at trial.

Carreon objected neither to the instructions related to the F.2 factor nor to the verdict form of eligibility submitted to the jury. Hence, absent fundamental error, he has waived this issue. *State v. Davis,* 206 Ariz. 377, 390 ¶ 62, 79 P.3d 64, 77 (2003).

¶ 56 The statute defines "serious offense" as "any of the following offenses: . . . 4. Aggravated assault resulting in serious physical injury . . . [and] 10. Kidnapping." A.R.S. § 13–703.H.4 & 6. By defining serious offense as *"any* of the following offenses," the legislature indicated that the jury does not need to unanimously find the presence of any particular prior conviction. Rather, the proffered list is definitional, presenting several alternatives, each of which, by itself, fulfills the meaning of the single statutory concept embraced in section 13–703.F.2. The jury need not agree as to precisely which of the listed offenses fulfills the definition of "serious offense," so long as each juror concludes that the defendant was convicted of *any* serious offense as listed within the statute.

¶ 57 The jury's finding that Carreon had previously been convicted of a serious offense therefore complies with the statute even if six jurors concluded Carreon had been convicted of kidnapping and six found he had been convicted of aggravated assault. To find the F.2 aggravator, the jury had to find beyond a reasonable doubt that Carreon had been previously convicted of a serious offense, not any one crime in particular. In this case, the jury did exactly that.

■ ¶ 58 Carreon presses a third argument regarding the jury's finding of the F.2 aggravator. In support of the aggravator, the court admitted, pursuant to stipulation, documentation of Carreon's convictions for aggravated assault and kidnapping. As previously noted, both convictions arose from the same criminal transaction. Carreon argues that the trial court should have instructed the jury that multiple crimes arising from the same criminal transaction count as only one previous criminal conviction. Relying on *State v. Kelly,* 190 Ariz. 532, 950 P.2d 1153 (1997), Carreon contends that the trial court's lack of instruction caused the jury to

erroneously treat one criminal transaction that resulted in two convictions as two separate offenses.[13]

¶ 59 *Kelly* and its progeny, however, clarify the application of A.R.S. § 13–604.M, not A.R.S. § 13–703, which defines the aggravating factors involved here. Section 13–604.M states that "[c]onvictions for two or more offenses committed on the same occasion shall be counted as only one conviction for the purposes of this section." A.R.S. § 13–604.M (2001). Section 13–703, unlike section 13–604, does not contain a "same occasion" provision that limits the availability of certain serious offenses under section 13–703.F.2. To the contrary, section 13–703.F.2 states that "[c]onvictions for serious offenses committed on the same occasion as the homicide, or not committed on the same occasion but consolidated for trial with the homicide, shall be treated as a serious offense under this paragraph." The broad reach of this language, explicitly embracing not only previous crimes but also those committed on the same occasion as the homicide, strongly indicates that the legislature intended to depart, in the capital context, from the language of section 13–604.M. We uphold the jury's finding of the F.2 aggravator.

**2.**

¶ 60 The jury also found beyond a reasonable doubt that the "defendant committed the offense while: (a) In the custody of or on authorized or unauthorized release from the state department of corrections, a law enforcement agency or a county or city jail." A.R.S. § 13–703.F.7(a). Carreon avers that the State presented insufficient evidence to support that finding.

■ ¶ 61 The state meets its burden of proving the F.7 aggravator by offering documentary evidence establishing the defendant's release status and that the defendant is the person to whom the document refers. *State v. Hurley,* 154 Ariz. 124, 132, 741 P.2d 257, 265 (1987); *see also State v. Hauss,* 140 Ariz. 230, 231, 681 P.2d 382, 383 (1984).

---

13. Once again, Carreon failed to raise this issue below so, absent fundamental error, he has waived this issue. *See State v. Davis,* 206 Ariz. 377, 390 ¶ 62, 79 P.3d 64, 77 (2003).

¶ 62 Carreon's counsel stipulated to the documentation offered in support of the F.7 factor. The documentation provided a sufficient basis for the jury to find that Carreon committed the offense while on authorized release from the state department of corrections and that Carreon was the person referenced in the documentation.

### 3.

¶ 63 The jury also found that Carreon, "[i]n the commission of the offense ... knowingly created a grave risk of death to another person or persons in addition to the person murdered." A.R.S. § 13–703.F.3. The State alleged that Carreon subjected Aragon's two children to a grave risk of death during his attack on their mother. Carreon contends that the F.3 factor applies only if the record supports the conclusion that he created a grave risk of death to the boys during the commission of "the offense," which refers to the murder of Hernandez. To establish the F.3 aggravator, the state must prove that "during the course of the killing, the defendant knowingly engaged in conduct that created a real and substantial likelihood that a specific third person might suffer fatal injuries." *State v. Gonzales,* 181 Ariz. 502, 514, 892 P.2d 838, 850 (1995) (citation omitted). In *State v. McCall,* this Court held that, "[i]n each of the Arizona cases where the finding of this aggravating circumstance has been affirmed, the murderous act itself put other people in a zone of danger." 139 Ariz. 147, 160, 677 P.2d 920, 933 (1983). We recently affirmed that holding in *State v. Tucker,* 205 Ariz. 157, 68 P.3d 110 (2003). There, the State alleged that leaving an infant alone after Tucker murdered the three adults in the infant's home created a substantial risk of death to the child, and the trial court agreed that the facts established the F.3 aggravator. Id. at 168 ¶ 59, 68 P.3d at 121. We set aside that finding, in part because we could not "conclude beyond a reasonable doubt that any reasonable jury would have found ... that the risk of death to the child was present during Tucker's murderous attacks on the other three victims." Id.

¶ 64 While Aragon's boys were present during the attack on their mother, they were not within the zone of danger created by Carreon's murderous attack on Hernandez.

The shots fired during that attack were aimed in a direction opposite from the boys' room. Therefore, none of the bullets fired during that attack placed the boys in danger. Thus, for the purposes of this case, no evidence submitted to the jury could sustain its finding of the F.3 aggravator. On this point, we reverse the findings of the jury and strike the F.3 aggravator.

### 4.

¶ 65 Finally, the jury found, beyond a reasonable doubt, the existence of the F.5 aggravator, that Carreon "committed the offense as consideration for the receipt, or in expectation of the receipt of anything of pecuniary value." A.R.S. § 13–703.F.5. A jury may find the existence of the pecuniary gain aggravating factor "if the expectation of pecuniary gain is a motive, cause, or impetus for the murder and not merely a result of the murder." *State v. Hyde,* 186 Ariz. 252, 280, 921 P.2d 655, 683 (1996). The finding of pecuniary gain may be based on tangible evidence or strong circumstantial evidence. *Id.* at 279, 921 P.2d at 683. In this case, the evidence presented at trial indicated that Richard Trujillo had a problem with Hernandez stemming from Richard Trujillo's belief that Hernandez had "snitched" on his brother, Frank Trujillo, and had caused Frank to go to prison. In addition, Aragon testified that Trujillo and Bobby Palofax had told her that they "wanted to get rid of" Hernandez and intended to harm or kill him. The evidence also indicated that Carreon was destitute the night before the murder and had asked Hernandez for $100 to pay his rent. Finally, the day after the murder, investigating officers found Carreon in front of Trujillo's house. When arrested, Carreon had $1005.22 in his wallet.

¶ 66 Carreon argues that this evidence was insufficient to prove that he committed the offense for pecuniary gain. Carreon points out that no evidence showed that he received the money in his wallet from Trujillo. The fact he needed money, Carreon contends, is insufficient as a matter of law to establish the F.5 aggravator.

¶ 67 A defendant's lack of money, by itself, is insufficient to establish the pecu-

niary gain aggravator. *State v. Styers,* 177 Ariz. 104, 115, 865 P.2d 765, 776 (1993) (holding evidence of financial trouble was insufficient to establish beyond a reasonable doubt that the defendant committed the offense for pecuniary gain). Moreover, the state must show that pecuniary gain was a motive, cause, or impetus for the murder, not simply its result. *State v. Spencer,* 176 Ariz. 36, 43, 859 P.2d 146, 153 (1993); *see also State v. Greenway,* 170 Ariz. 155, 164, 823 P.2d 22, 31 (1991). As this Court has repeatedly held, the presence of the pecuniary gain aggravator may not be found every time a defendant murders and is later shown to have obtained pecuniary benefit. *See State v. Spears,* 184 Ariz. 277, 292, 908 P.2d 1062, 1077 (1996); *State v. Correll,* 148 Ariz. 468, 479, 715 P.2d 721, 732 (1986).

¶ 68 The State presented no direct evidence that the Trujillos paid Carreon to murder Hernandez and Aragon. Indeed, the State never established any direct connection between Carreon and the Trujillos. The State offered no evidence that Carreon committed these offenses for pecuniary gain beyond the simple fact that Carreon was destitute one day and possessed more than $1000 the next. These facts simply do not establish beyond a reasonable doubt that pecuniary gain provided the motive for Carreon to murder Hernandez. For that reason, we set aside the jury's finding of the F.5 aggravator.

## I.

¶ 69 The jury found no mitigating factors sufficient to outweigh the aggravation evidence presented. Accordingly, the jury sentenced Carreon to death. A.R.S. § 13-703.E. Carreon asserts that five errors occurred with regard to his mitigation evidence and its balancing with the findings of aggravation.

### 1.

¶ 70 Carreon first contends that the trial court abused its discretion by refusing to permit Dr. Blackwood, his mental health expert, to testify. After Carreon gave notice of his intent to call the mental health expert, the State requested an opportunity to examine Carreon for purposes of the penalty hearing. Initially, Carreon agreed. The trial court ordered that, upon his completing Carreon's examination, Dr. Blackwood should notify defense counsel of his preliminary findings. Additionally, the court ordered defense counsel to notify the State if Carreon intended to call the doctor as an expert witness so that the State would have an opportunity to arrange for its mental health expert to examine Carreon.

¶ 71 Later, Carreon asserted a Fifth Amendment right to refuse examination by the State's mental health expert. He argued that prior to a finding of guilt, he should not have to risk speaking with an agent of the State whose conversations with Carreon were unprotected by a confidentiality privilege.

¶ 72 The trial court ordered that Carreon's expert would be precluded from testifying at the penalty phase if Carreon did not comply with the court's order allowing his examination by the State's doctor. Although the State conceded that any information obtained during the examination could not be used to establish guilt, Carreon requested that all notes and findings from the examination be sealed until a finding of guilt.[14] The trial court denied Carreon's request, specifically finding that both sides should have the information available to prepare for the penalty phase.

¶ 73 After the jury's finding of guilt, Carreon renewed his request to permit Dr. Blackwood to testify. The State objected, claiming that it did not know to what Blackwood would testify. The trial court affirmed its earlier denial. Carreon then made an offer of proof, stating that Dr. Blackwood had performed a neuropsychological evaluation of Carreon and found evidence of brain damage due to the abuse of chemical inhalants.

¶ 74 We find no abuse of discretion in the trial court's order precluding Dr. Blackwood's testimony. As this Court has previously held, "once a defendant notifies

14. We previously have rejected the argument that any report generated after a mental health examination of a defendant must be filed under seal and released only if the jury returns a guilty verdict. *Phillips v. Araneta,* 208 Ariz. 280, 284 ¶ 13, 93 P.3d 480, 484 (2004).

the state that he intends to place his mental condition at issue during the penalty phase of a capital trial, a trial judge has discretion to order the defendant to submit to a mental examination by an expert chosen by the state or the court." *Phillips v. Araneta*, 208 Ariz. 280, 283 ¶ 9, 93 P.3d 480, 483 (2004). In addition, "the trial judge can preclude [a capital defendant] from presenting mental health-related mitigation evidence if he refuses to comply with an order directing him to cooperate with the State's mental health evaluation." *Id.* at 286 ¶ 20, 93 P.3d at 486. The trial court did not err in precluding Dr. Blackwood's testimony after Carreon refused to comply with the court's order that he be examined by the State's mental health expert.

### 2.

¶ 75 Carreon also asserts that the trial judge improperly and incompletely instructed the jury about "impairment" as a mitigating circumstance. During the penalty phase of his trial, the trial court, without objection from Carreon's counsel, instructed the jury on its duty to consider mitigating circumstances. Those instructions included the following:

> Mitigation includes anything offered by the defendant or the state before or during this phase of the trial helpful in determining whether to impose a sentence less than death. It may include any aspect of the defendant's character, propensities or record and any evidence relating to the offense. Mitigation may include, but is not limited to:
> 1. Traumatic childhood;
> 2. Mercy;
> 3. The defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly impaired, but not so impaired as to constitute a defense to prosecution;
> 4. Residual doubt.

¶ 76 Following deliberations, the jury found that Carreon should be sentenced to death. Carreon contends that the trial court instructed the jurors using an erroneous "significant impairment" standard and that nothing in the jury's verdict indicates that it considered his impairment as a non-statutory mitigating circumstance. As a result, Carreon contends, we cannot determine whether the jury would have sentenced him to death had it considered impairment as a non-statutory factor. Thus, Carreon argues, the matter must be remanded for another sentencing procedure prefaced with proper judicial guidance. Because Carreon did not object, we review this matter for fundamental error. *See Valenzuela*, 194 Ariz. at 405 ¶ 2, 984 P.2d at 13.

¶ 77 Our statutes provide that a jury may consider as a mitigating circumstance that "[t]he defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly impaired, but not so impaired as to constitute a defense to prosecution." A.R.S. § 13–703.G.1; *see also State v. Gallegos*, 178 Ariz. 1, 16, 870 P.2d 1097, 1112 (1994). In this case, the court's instruction mirrors the statutory language for the G.1 mitigating factor. As a result, this instruction correctly described the statutory finding of impairment.

¶ 78 Carreon maintains, however, that the trial court inadequately instructed the jurors as to impairment as a non-statutory mitigating factor. In *Gallegos*, this Court confronted a similar situation because nothing in the trial court's special verdict indicated that the trial judge considered whether the defendant's impairment constituted a non-statutory mitigator. In that case we held:

> [W]e agree with the trial judge's determination that defendant was not significantly impaired on the night of the murder, and therefore, his impairment does not constitute a mitigating factor under § 13–703(G)(1). A trial court's inquiry, however, must not end there.
>
> Although defendant's impairment on the night of the murder did not rise to the level of a *statutory* mitigating circumstance, the trial judge should have considered whether such impairment, when viewed in light of defendant's alleged history of alcohol and drug abuse, constituted a *non-statutory* mitigating circumstance. Yet, nothing in the special verdict indicates that the trial judge made this determination. We therefore must examine the

record to determine whether defendant's impairment constitutes a non-statutory mitigating circumstance.

*Id.* at 17–18, 870 P.2d at 1113–14 (citations omitted).

¶ 79 After reviewing "the evidence that defendant was impaired to some degree on the night of the murder, as well as his history of drug and alcohol abuse," we found the existence of this non-statutory mitigator. *Id.* at 18, 870 P.2d at 1114. The crucial difference between *Gallegos* and this case, however, is that Carreon offered no substantial evidence of impairment. "Without a showing of some impairment at the time of the offense, drug use cannot be a mitigating circumstance of any kind." *State v. Williams,* 183 Ariz. 368, 384, 904 P.2d 437, 453 (1995).

¶ 80 Our independent review of the record reveals some evidence suggesting that Carreon had a history of drug abuse and that he may have been impaired when arrested. The record, however, includes no evidence that Carreon was under the influence of drugs or alcohol on January 23, 2001, the night he committed the offenses. We conclude, therefore, that impairment is not present as a non-statutory mitigating factor. Thus, no error occurred.

### 3.

¶ 81 Carreon also contends that the trial judge improperly instructed the jury as to sympathy during the aggravation and penalty phases of his trial. During the aggravation phase, the court instructed the jurors that they were "not to be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion, or public feeling." Similarly, during the penalty phase of the trial, the court instructed the jurors that they "must not be influenced by sympathy or prejudice." Carreon's counsel requested that the jurors also be told they were "limited to a rational inquiry and not an emotional response to the evidence." The trial court denied this request, stating that "the other instructions regarding sympathy or prejudice and the fact that the jury's not to consider those factors [provide] a sufficient instruction to cover that issue."

¶ 82 Carreon argues that the instructions given to the jury impermissibly limited the jurors from considering relevant mitigating evidence. He also maintains that an inherent conflict exists between the court's instruction that the jury may consider "mercy" as a mitigating factor but that it may not be influenced by "sympathy or prejudice." Because Carreon did not object to the instruction, we will not reverse on this issue unless fundamental error occurred. *See Valenzuela,* 194 Ariz. at 405 ¶ 2, 984 P.2d at 13.

¶ 83 The Eighth and Fourteenth Amendments of the United States Constitution require that the sentencer in a capital case "not be precluded from considering, *as a mitigating factor,* any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett v. Ohio,* 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978); *see also California v. Brown,* 479 U.S. 538, 541, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987) ("[T]he capital defendant generally must be allowed to introduce any relevant mitigating evidence regarding his character or record and any of the circumstances of the offense.") (citations omitted). The Constitution does not require, however, that a jury "be able to dispense mercy on the basis of a sympathetic response to the defendant." *Johnson v. Texas,* 509 U.S. 350, 371, 113 S.Ct. 2658, 125 L.Ed.2d 290 (1993); *Brown,* 479 U.S. at 541–43, 107 S.Ct. 837.

¶ 84 The instruction from Carreon's trial is almost identical to the challenged instruction from *California v. Brown,* in which the United States Supreme Court found no error in telling jurors they "must not be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling." 479 U.S. at 540, 107 S.Ct. 837. The Court concluded that "a reasonable juror would not interpret the challenged instruction in a manner that would render it unconstitutional." *Id.* at 541–42, 107 S.Ct. 837. A reasonable juror would "understand the instruction not to rely on 'mere sympathy' as a directive to ignore only the sort of sympathy that would be totally divorced from the evidence...." *Id.* at 542, 107 S.Ct. 837. The

Court then stated that, reading the instruction as a whole, "a rational juror could hardly hear this instruction without concluding that it was meant to confine the jury's deliberations to considerations arising from the evidence presented, both aggravating and mitigating." *Id.* at 543, 107 S.Ct. 837.

¶ 85 Similarly, the trial court's instruction here that the jurors "must not be influenced by sympathy or prejudice" did not cause error, let alone fundamental error. In *Saffle v. Parks*, 494 U.S. 484, 110 S.Ct. 1257, 108 L.Ed.2d 415 (1990), the Court reviewed a jury instruction that directed the jurors to "avoid any influence of sympathy, sentiment, passion, prejudice, or other arbitrary factor when imposing sentence." *Id.* at 487, 110 S.Ct. 1257. On appeal, the defendant argued that the omission of the word "mere," as a modifier of "sympathy," erroneously directed the jurors "to ignore sympathy that *is* based on the mitigating evidence." *See Parks v. Brown*, 860 F.2d 1545, 1553 (10th Cir.1988), *rev'd by Saffle v. Parks*, 494 U.S. 484, 110 S.Ct. 1257, 108 L.Ed.2d 415 (1990). Concluding that the jurors may have read the anti-sympathy instruction as constraining their ability to consider the mitigating evidence, the Tenth Circuit Court of Appeals remanded the case for resentencing. *Brown*, 860 F.2d at 1558. The Supreme Court granted certiorari and reversed the Tenth Circuit.

■ ¶ 86 In rejecting the argument that the anti-sympathy instruction impermissibly limited the consideration of mitigating evidence, the Court stated:

This argument misapprehends the distinction between allowing the jury to consider mitigating evidence and guiding their consideration. It is no doubt constitutionally permissible, if not constitutionally required, for the State to insist that "the individualized assessment of the appropriateness of the death penalty [be] a moral inquiry into the culpability of the defendant, and not an emotional response to the mitigating evidence." ... At the very least, nothing in *Lockett* and *Eddings [v. Oklahoma*, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982)] prevents the State from attempting to ensure reliability and nonarbitrariness by requiring that the jury consider and give effect to the defendant's mitigating evidence in the form of a "rea-

soned *moral* response" rather than an emotional one. The State must not cut off full and fair consideration of mitigating evidence; but it need not grant the jury the choice to make the sentencing decision according to its own whims or caprice.

*Saffle*, 494 U.S. at 492–93, 110 S.Ct. 1257 (quoting *Brown*, 479 U.S. at 545, 107 S.Ct. 837) (citations omitted).

¶ 87 As occurred in *Saffle*, the court's instruction in this case, which also omitted the modifier "mere," correctly stated the law. The judge specifically instructed the jury that it could consider "mercy" as a mitigating factor, and Carreon argued this circumstance to the jury. The additional sympathy instruction did not prevent the jury from considering "mercy" or other relevant mitigating circumstances. Instead, the instruction served "the useful purpose of confining the jury's imposition of the death sentence by cautioning it against reliance on extraneous emotional factors which ... would be far more likely to turn the jury against a capital defendant than for him." *Brown*, 479 U.S. at 543, 107 S.Ct. 837.

**4.**

■ ¶ 88 During the aggravation phase of Carreon's trial, the trial court, without objection by Carreon's counsel, instructed the jurors that "[a]ggravating circumstances are those which increase the guilt or the enormity of the offense." On appeal, Carreon contends that this instruction misstated the law by instructing the jury that an aggravating circumstance makes a defendant more guilty than the average defendant and thus implies that on that basis alone he may be sentenced to death. Specifically, Carreon argues that this instruction impermissibly skewed the life and death balancing process. Because Carreon did not object to this instruction, we review only for fundamental error. *See Valenzuela*, 194 Ariz. at 405 ¶ 2, 984 P.2d at 13.

¶ 89 Arizona recognizes ten aggravating factors that the trier of fact shall consider in determining whether to impose a sentence of death, *see* A.R.S. § 13–703.F, but the statute does not explicitly define "aggravating circumstances." Black's Law Dictionary defines "aggravating circumstance" as "[a] fact

or situation that increases the degree of liability or culpability for a tortious or criminal act." Black's Law Dictionary 236 (7th Ed.1999). The court of appeals has previously defined an aggravating factor as "any factor ... that increases the guilt or enormity of a crime or adds to its injurious consequences." *State v. Long*, 207 Ariz. 140, 147 ¶ 39, 83 P.3d 618, 625 (App.2004). The trial court's definition of "aggravating circumstances" closely tracks these definitions. Reading the instructions as a whole, we see no reasonable likelihood that the challenged instruction deprived Carreon of a "right essential to his defense, [or made him] unable to receive a fair trial, or ... [went] to the very foundation of [his] theory of the case." *Valenzuela*, 194 Ariz. at 407 ¶ 15, 984 P.2d at 15 (1999) (citations omitted). Although this court has never considered the propriety of this instruction, we conclude that, in this case, the trial court did not commit fundamental error in instructing the jury.

### 5.

 ¶ 90 Carreon also argues that the admission of victim impact statements after the introduction of his mitigation evidence unduly prejudiced the jury. Arizona law permits victim impact evidence to rebut the defendant's presentation of mitigation. Ariz. Const. art. 2, § 2.1(A).4 (entitling a victim, among other things, to be heard at sentencing); A.R.S. § 13–703.01.R (stating that a victim has the right to present information at the penalty phase); A.R.S. § 13–4426 (2001) (stating that the victim may address the sentencing authority and present any information or opinions that concern the victim or the victim's family).[15]

¶ 91 The State offered the testimony of Aragon and Hernandez' two sisters to rebut Carreon's proffered mitigation. In characterizing this evidence as unduly prejudicial, Carreon points to the testimony of Helen Hernandez, who stated that Hernandez' daughter "almost committed suicide because she felt blamed" and also that his son was "not going to school, hanging out with the wrong crowd [and] getting into drugs."

 ¶ 92 The United States Supreme Court has cautioned that victim impact evidence should not be allowed if it is "so unduly prejudicial that it renders the trial fundamentally unfair...." *Payne v. Tennessee*, 501 U.S. 808, 825, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991). We conclude that Ms. Hernandez' testimony did not render the sentencing procedure fundamentally unfair.

¶ 93 Ms. Hernandez testified, with little embellishment, about how Hernandez' murder had affected his children, testimony that fits within the boundaries defined by Arizona law. *See Lynn v. Reinstein*, 205 Ariz. 186, 68 P.3d 412 (2003) (holding that victims may testify about the personal characteristics of the deceased and about the murder's impact on the deceased's family, but may not recommend a sentence). In addition, the trial court cautioned the jury not to consider the impact statements as aggravation and not to be tainted by sympathy or prejudice. We find no error.

### J.

 ¶ 94 Based upon our independent review of the jury's findings of aggravation and mitigation, we have vacated the jury's findings on both the F.5 (pecuniary gain) and F.3 (endangerment) aggravators. We next consider whether we should remand for resentencing or independently reweigh the remaining aggravation and mitigation factors.

¶ 95 Section 13–703.04[16] provides the mechanism for our review of death sentences. Subsection B states:

> If the supreme court determines that an error was made regarding a finding of aggravation or mitigation, the supreme court shall independently determine if the mitigation the supreme court finds is sufficiently substantial to warrant leniency in light of the existing aggravation. If the

---

**15.** "Victim" includes "the murdered person's spouse, parent, child or other lawful representative." A.R.S. § 13–703.01.S.2.

**16.** Carreon argues that A.R.S. § 13–703.05.A, the newly enacted statute that describes this Court's

review of the jury's findings of aggravation and mitigation, is unconstitutional as a violation of the separation of powers doctrine. This issue is not properly before this Court because A.R.S. § 13–703.04, not section 13–703.05, applies to this action. *See* n. 11 *supra*.

supreme court finds that the mitigation is not sufficiently substantial to warrant leniency, the supreme court shall affirm the death sentence. If the supreme court finds that the mitigation is sufficiently substantial to warrant leniency, the supreme court shall impose a life sentence pursuant to § 13–703, subsection A.

¶ 96 Subsection C recognizes that, in some circumstances, remand rather than reweighing may be appropriate by stating that this court is not precluded from remanding for further action "if the trial court erroneously excluded evidence or if the appellate record does not adequately reflect the evidence presented." [17] A.R.S. § 13–703.04.C. The aim of the statute, therefore, is clear: absent one of the circumstances defined in the statute, this Court should reweigh the aggravating and mitigating factors. In this case, the trial court did not wrongly exclude evidence, and the appellate record adequately reflects the evidence presented. It is thus appropriate for this Court to engage in independent reweighing of the aggravating and mitigating factors.

¶ 97 The statute uses language identical to superseded A.R.S. § 13–701.01.B (1994), which we applied to independently reweigh mitigating and aggravating factors. In doing so, we rejected a strictly mathematical approach and held that in "weighing, we consider the quality and the strength, not simply the number of aggravating and mitigating factors." *State v. Greene,* 192 Ariz. 431, 443 ¶ 60, 967 P.2d 106, 118 (1998). Thus, in *Greene,* although we balanced only one aggravator against several mitigators, we concluded that the mitigation, taken as a whole, was not sufficient to overcome the aggravation and that death was an appropriate sentence. *Id.* at 443–44 ¶ 60, 967 P.2d at 118–19. We have followed the same approach in other cases, concentrating on the quality of the proven aggravation and mitigation, not on the sheer volume of either. *See, e.g., State v. Rogovich,* 188 Ariz. 38, 932 P.2d 794 (1997)

(holding that quality of three aggravating circumstances outweighed quality of six mitigators and thus death was appropriate); *State v. Lehr,* 201 Ariz. 509, 38 P.3d 1172 (2002) (holding that quality of aggravators outweighed quality of mitigators and thus death was appropriate sentence).

■ ¶ 98 In this case, although we have vacated the jury's findings on the F.3 and F.5 aggravators, the jury also found the existence of the F.2 and F.7 aggravating factors beyond a reasonable doubt, and our independent review of those findings has left them undisturbed. The trial judge properly instructed the jury on mitigation, and the jury concluded that it was not sufficiently substantial to call for leniency.

¶ 99 We have conducted our own review of the mitigation proffered in Carreon's case. Carreon offered some evidence of a troubled childhood and unsubstantiated allegations of drug abuse. We find this evidence of no more than *de minimis* value.

¶ 100 We have previously confronted factual situations similar to that at hand, when we balanced aggravating factors against mitigation of no more than *de minimis* value. In such cases, we have upheld the sentence of death because, in such cases, "[t]here is simply nothing to weigh or balance. . . ." *State v. Bible,* 175 Ariz. 549, 609, 858 P.2d 1152, 1212 (1993); *see also State v. Soto–Fong,* 187 Ariz. 186, 211, 928 P.2d 610, 635 (1996) (finding remand unnecessary, citing *Bible,* when one aggravator set aside but mitigating evidence is *de minimis* ); *State v. King,* 180 Ariz. 268, 289, 883 P.2d 1024, 1045 (1994) (holding that where no new evidence was to be received, no evidence was improperly excluded, and mitigating evidence was, at best, *de minimis,* supreme court could reweigh factors, citing *Bible* ). We find so also in this case. Balancing mitigating evidence of no more than *de minimis* weight against two statutory aggravators found by a jury beyond a reason-

---

17. The statutory language incorporates prior holdings of this Court. In *State v. Trostle,* 191 Ariz. 4, 951 P.2d 869 (1997), we outlined the circumstances that might mandate remand. In that case, this Court held that the trial court failed to give sufficient weight to the defendant's evidence of mental impairment. *Id.* at 21, 951 P.2d at 886. We next held that "remand is

generally not appropriate unless the judge wrongly excluded evidence or the record does not adequately reflect all the relevant facts." *Id.* at 23, 951 P.2d 869; *see also State v. Gulbrandson,* 184 Ariz. 46, 906 P.2d 579 (1995) (holding that where the trial court did not improperly exclude mitigating evidence, independent rebalancing was appropriate).

able doubt, we affirm Carreon's death sentence.

## III.

¶ 101 At sentencing, the trial court ordered that the sentence for Count 3, first degree burglary, be served consecutively to Count 2, attempted murder. The court also ordered Counts 4 and 5, endangerment, to run consecutively to each other, and for Count 4 to run consecutively to Count 3. Finally, the court ordered Count 6, misconduct involving weapons, to run consecutively to Count 4. Carreon contends that neither the sentence for Count 3, burglary in the first degree, nor that for Count 6, misconduct involving weapons, may be imposed consecutively under A.R.S. § 13–116 (2001), the statutory bar against double punishment.

¶ 102 Section 13–116 states: "An act or omission which is made punishable in different ways by different sections of the laws may be punished under both, but in no event may sentences be other than concurrent." *Id.* This Court has held that section 13–116 precludes the imposition of consecutive sentences if the defendant's conduct is deemed a "single act." In *State v. Gordon,* we explained:

[W]e will ... judge a defendant's eligibility for consecutive sentences by considering the facts of each crime separately, subtracting from the factual transaction the evidence necessary to convict on the ultimate charge—the one that is at the essence of the factual nexus and that will often be the most serious of the charges. If the remaining evidence satisfies the elements of the other crime, then consecutive sentences may be permissible under A.R.S. § 13–116. In applying this analytical framework, however, we will then consider whether, given the entire "transaction," it was factually impossible to commit the ultimate crime without also committing the secondary crime. If so, then the likelihood will increase that the defendant committed a single act under A.R.S. § 13–116. We will then consider whether the defendant's conduct in committing the lesser crime caused the victim to suffer an additional risk of harm beyond that inherent in the ultimate crime. If so, then ordinarily the court should find that the defendant committed multiple acts and should receive consecutive sentences.

161 Ariz. 308, 315, 778 P.2d 1204, 1211 (1989).

¶ 103 Because there were two victims in this case, our definition of "ultimate crime" varies by victim. The trial judge ordered that the sentences in question run consecutively not to that for the murder of Hernandez, but to the sentence imposed for the attempted murder of Aragon. For purposes of our analysis, therefore, Aragon's attempted murder is the "ultimate crime."

¶ 104 Applying the first prong of the *Gordon* test, we subtract the evidence necessary to convict Carreon of attempted murder. A person attempts first-degree murder if:

acting with the kind of culpability otherwise required for commission of [first-degree murder], such person: 1. Intentionally engages in conduct which would constitute an offense if the attendant circumstances were as such person believes them to be . . . .

A.R.S. § 13–1001.A.1 (2001). To act with the culpability for first-degree murder, Carreon must have "[i]ntend[ed] or know[n] that [his] conduct [would] cause death, [and have] cause[d] the death of another with premeditation." A.R.S. § 13–1105.A.1 (2001). There is little doubt that Carreon intended to cause the death of Aragon. Subtracting the evidence that supports that conclusion from the factual transaction here, we next examine the remaining evidence to determine if it supports Carreon's conviction for burglary.

¶ 105 A person commits burglary in the first degree by violating the provisions of A.R.S. § 13–1507 (2001) and knowingly possessing a deadly weapon. A.R.S. § 13–1508.A (2001). A person violates the provisions of § 13–1507 "by entering or remaining unlawfully in or on a residential structure with the intent to commit any theft or felony therein." A.R.S. § 13–1507.A. The remaining evidence shows that Carreon entered the Hernandez home and, armed with a deadly weapon, intended to kill Hernandez. Thus, under the first prong of *Gordon,* we conclude that Carreon may be eligible for consecutive sentences under A.R.S. § 13–116. We therefore apply the next prong of the *Gordon* test,

whether Carreon could have committed burglary without committing attempted murder.

¶ 106 Applying the second prong, we conclude that Carreon could have committed burglary without committing the attempted murder of Aragon. Given the entire transaction involved here, Carreon's actions that led to his conviction for burglary are distinct from his actions that led to his conviction for the attempted murder of Aragon. Carreon's act of entering the Hernandez residence with the intent to commit the felony of murdering Hernandez justified the jury's decision to convict him of that crime. Carreon's actions involved in his attempted murder of Aragon are distinct from the acts that comprised burglary. Carreon thus did not commit a "single act" within the meaning of § 13–116.

¶ 107 Applying the *Gordon* analysis to Carreon's conviction of misconduct involving weapons, we arrive at a different conclusion. A person commits misconduct involving weapons by "knowingly ... [p]ossessing a deadly weapon if such person is a prohibited possessor...." A.R.S. § 13–3102.A.4 (2001). A "prohibited possessor" includes a person "[w]ho has been convicted within or without this state of a felony." A.R.S. § 13–3101, subd. A, par. 6(b) (2001). Subtracting from the factual transaction the evidence necessary to convict on the attempted murder charge, the remaining evidence satisfies the elements of misconduct involving weapons.

¶ 108 Under the second prong of the *Gordon* analysis, however, Carreon could not have attempted the murder of Aragon without also committing misconduct involving weapons. Carreon is a prohibited possessor. He used a gun in attempting to kill Aragon. Under these facts, it was factually impossible for Carreon to shoot Aragon without also committing misconduct involving weapons.

¶ 109 Applying the third prong of the *Gordon* analysis, we conclude that Carreon's misconduct involving weapons did not expose Aragon to a risk that exceeded that inherent in the attempt on her life. Therefore, we order that Carreon's sentence for Count 6 be modified to run concurrently with that for Count 2. *See* A.R.S. § 13–4037.A (2001).

## IV.

¶ 110 Finally, Carreon raises a number of arguments regarding the constitutionality of Arizona's death penalty, all of which he concedes this Court has already rejected. Despite his failure to offer any arguments in support of these challenges, we address them briefly.

¶ 111 First, he contends that the death penalty is cruel and unusual punishment under any circumstances under both the United States and Arizona constitutions. We disagree. Both the United States Supreme Court and this Court have rejected this argument. *See Gregg v. Georgia,* 428 U.S. 153, 186–87, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); *State v. Salazar,* 173 Ariz. 399, 411, 844 P.2d 566, 578 (1992).

¶ 112 Second, Carreon argues that the death penalty is imposed arbitrarily and irrationally in Arizona. We addressed and rejected this claim in *State v. Beaty,* 158 Ariz. 232, 248, 762 P.2d 519, 535 (1988).

¶ 113 Third, he contends that the prosecutor's discretion to seek the death penalty has no standards. We rejected a similar claim in *State v. Spears,* 184 Ariz. 277, 291, 908 P.2d 1062, 1076 (1996).

¶ 114 Fourth, he argues that the death penalty is applied so as to discriminate against poor, young, and male defendants in violation of the Arizona Constitution. We rejected this argument in *State v. Stokley,* 182 Ariz. 505, 516, 898 P.2d 454, 465 (1995).

¶ 115 Fifth, he contends that the absence of proportionality review denies defendants due process. We rejected this contention in *State v. Harrod,* 200 Ariz. 309, 320 ¶ 65, 26 P.3d 492, 503 (2001). *See also Salazar,* 173 Ariz. at 416, 844 P.2d at 583 (noting that "no statute requires or suggests proportionality reviews in death cases").

¶ 116 Sixth, Carreon argues that the death penalty scheme is unconstitutional because it does not require the State to prove that the penalty is appropriate. We rejected this claim in *State v. Gulbrandson,* 184 Ariz. 46, 72, 906 P.2d 579, 605 (1995).

¶ 117 Seventh, Carreon argues that A.R.S. § 13–703.01 provides no objective standards

to guide the sentencing judge in weighing aggravating and mitigating circumstances. We rejected this claim in *State v. White*, 194 Ariz. 344, 351 ¶ 24, 982 P.2d 819, 826 (1999).

¶ 118 Eighth, he contends that Arizona's death penalty is unconstitutional because it does not require the sentencer to find beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating circumstances. We rejected this argument in *State v. Poyson*, 198 Ariz. 70, 83 ¶ 59, 7 P.3d 79, 92 (2000).

¶ 119 Ninth, Carreon contends that A.R.S. § 13–703.02 does not sufficiently channel the sentencer's discretion. We rejected this claim in *State v. Greenway*, 170 Ariz. 155, 164, 823 P.2d 22, 31 (1991).

¶ 120 Tenth, he argues that lethal injection is cruel and unusual punishment. This claim was rejected in *State v. Hinchey*, 181 Ariz. 307, 315, 890 P.2d 602, 610 (1995).

¶ 121 Eleventh, Carreon argues that Arizona's death penalty statute unconstitutionally requires imposition of the death penalty whenever at least one aggravating circumstance and no mitigating circumstances exist. We rejected this challenge in *State v. Bolton*, 182 Ariz. 290, 310, 896 P.2d 830, 850 (1995).

¶ 122 Twelfth, Carreon argues that Arizona's death penalty is unconstitutional because it requires defendants to prove that their lives should be spared. We rejected an identical claim in *State v. Fulminante*, 161 Ariz. 237, 258, 778 P.2d 602, 623 (1988).

¶ 123 Finally, Carreon asserts that the imposition of capital punishment in this case constitutes cruel and unusual punishment. His failure to define any specific argument, other than those already rejected, prevents further consideration of this argument. *State v. Kemp*, 185 Ariz. 52, 57, 912 P.2d 1281, 1286 (1996) (holding that counsel, to avoid preclusion of issue on appeal, must briefly argue issue in body of brief and list of issues in brief is not adequate).

## V.

¶ 124 The trial court sentenced Carreon to aggravated prison terms for his non-capital convictions. As to Count 2, attempted first degree murder of Aragon, and Counts 4 and 5, the endangerment of Aragon's children, the trial court judge found "that because of the defendant's conduct, they have suffered extreme emotional trauma as described here today by Miss Aragon." As to all counts, 2 through 6, the trial court judge also found the following aggravating factors:

> The defendant, as proven during the course of the trial, did have prior felony convictions and was on release at the time he committed these offenses. I further find that he's a stone-cold killer and a danger to society, all of which aggravating factors call for the maximum possible terms to be imposed.

¶ 125 In a supplemental brief filed after the United States Supreme Court issued its opinion in *Blakely v. Washington*, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), Carreon challenges the procedure by which the trial court imposed the aggravated sentences on his non-capital offenses. He asserts that the jury, not the trial judge, should have considered these aggravating circumstances. We will address this argument in a supplemental opinion.

## VI.

¶ 126 For the foregoing reasons, we affirm Carreon's convictions and the sentence of death. Pursuant to A.R.S § 13–4037.A, we order that Carreon's sentence on Count 6 run concurrent with that imposed for Count 2.

CONCURRING: CHARLES E. JONES, Chief Justice, REBECCA WHITE BERCH, MICHAEL D. RYAN and ANDREW D. HURWITZ, Justices.