SUPREME COURT OF ARIZONA
En Banc

| | |
|---|---|
| STATE OF ARIZONA, | ) Arizona Supreme Court |
| | ) No. CR-08-0025-AP |
| Appellee, | ) |
| | ) Maricopa County |
| v. | ) Superior Court |
| | ) No. CR2002-019595 |
| CLARENCE WAYNE DIXON, | ) |
| | ) |
| Appellant. | ) |
| | ) **O P I N I O N** |
| _____ | ) |

Appeal from the Superior Court in Maricopa County
The Honorable Andrew G. Klein, Judge

**AFFIRMED**
_____

THOMAS C. HORNE, ARIZONA ATTORNEY GENERAL                Phoenix
     By   Kent E. Cattani, Chief Counsel
          Criminal Appeals/Capital Litigation Section
          Jeffrey A. Zick, Assistant Attorney General
Attorneys for State of Arizona

BRUCE PETERSON, OFFICE OF THE LEGAL ADVOCATE            Phoenix
     By   Consuelo M. Ohanesian, Deputy Legal Advocate
Attorneys for Clarence Wayne Dixon
_____

**H U R W I T Z**, Vice Chief Justice

¶1      Clarence Wayne Dixon was convicted of first degree murder and sentenced to death.  We have jurisdiction over his automatic appeal under Article VI, Section 5(3) of the Arizona Constitution and A.R.S. §§ 13-4031 and 13-4033(A)(1) (2011).[1]

_____

[1]      This opinion cites the current version of statutes that have not materially changed since the events at issue.

## I.  FACTUAL AND PROCEDURAL BACKGROUND[2]

¶2     On January 6, 1978, Deana Bowdoin, a 21-year-old Arizona State University senior, had dinner with her parents and then went to a nearby bar to meet a female friend.  The two arrived at the bar at 9:00 p.m. and stayed until approximately 12:30 a.m., when Deana told the friend she was going home and drove away alone.

¶3     Deana and her boyfriend lived in a Tempe apartment. He returned to their apartment at about 2:00 a.m. after spending the evening with his brother and found Deana dead on the bed. She had been strangled with a belt and stabbed several times.

¶4     Investigators found semen in Deana's vagina and on her underwear, but could not match the resulting DNA profile to any suspect.  In 2001, a police detective checked the profile against a national database and found that the profile matched that of Clarence Dixon, an Arizona prison inmate.  Dixon had lived across the street from Deana at the time of the murder. None of Deana's friends or family knew of previous contact between her and Dixon.

¶5     Dixon was charged with first degree murder and chose to represent himself.  The jury found that he had committed both premeditated and felony murder.  In the aggravation phase, the

---

[2]  We view the facts "in the light most favorable to upholding the verdicts." *State v. Chappell*, 225 Ariz. 229, 233 ¶ 2 n.1, 236 P.3d 1176, 1180 n.1 (2010).

jury found that Dixon had previously been convicted of a crime punishable by life imprisonment, A.R.S. § 13-751(F)(1), and that the murder was especially cruel and heinous, A.R.S. § 13-751(F)(6). In the penalty phase, the jury determined that Dixon should be sentenced to death.

## II. ISSUES ON APPEAL

### A. Prosecutorial Misconduct

¶6 A woman testified at trial that Dixon sexually assaulted her in 1985 while she was a 21-year-old student at Northern Arizona University. The court admitted this testimony under Arizona Rule of Evidence 404(c) after conducting a pre-trial evidentiary hearing. Dixon does not deny that he committed the 1985 rape, but claims that because the medical examiner could not conclusively opine that Deana had also been raped, the prosecutor committed misconduct by offering the testimony of the 1985 victim.

### 1. Standard of review

¶7 A defendant seeking reversal of a conviction for prosecutorial misconduct must establish that "(1) misconduct is indeed present; and (2) a reasonable likelihood exists that the misconduct could have affected the jury's verdict, thereby denying [the] defendant a fair trial." *State v. Velazquez*, 216 Ariz. 300, 311 ¶ 45, 166 P.3d 91, 102 (2007) (alteration in original) (internal quotation marks omitted). Because Dixon

3

made no claim of prosecutorial misconduct below, we review for fundamental error. *See State v. Henderson*, 210 Ariz. 561, 567 ¶ 19, 115 P.3d 601, 607 (2005).

### 2. The prosecutor did not commit misconduct

¶8 The trial judge ruled the 1985 victim's testimony admissible after conducting a pre-trial evidentiary hearing. At trial, the prosecutor offered only the evidence that the judge expressly permitted in his pre-trial order. This is plainly not misconduct.

¶9 Dixon nonetheless argues that the prosecutor committed misconduct because he knew that the State could not prove that Deana had been raped, and the prior acts therefore could not demonstrate "an aberrant sexual propensity to commit the crime charged," as Rule 404(c)(1)(B) requires. The jury, however, convicted Dixon of felony murder, and rape was the charged predicate felony. On appeal, Dixon has not directly challenged the sufficiency of the evidence to support that verdict.

¶10 In any event, the record does not support Dixon's argument. Although the testifying medical examiner could not independently verify that Deana had been raped, he refused to rule out a sexual assault. Rather, he affirmed that "rape can occur with no injuries."

¶11 There was ample evidence from which the jury could conclude that Deana had been raped. She had left a bar alone at

4

12:30 a.m. and was found dead in her apartment, with a belt tightly cinched around her neck, only 90 minutes later. Dixon's semen was found on her underpants (which she had first put on that evening) and in her vagina. Deana had no known previous acquaintance with Dixon. She had indentations on her right wrist, indicating she had been restrained. Her clothing was disheveled, and she had urinated on the bed. Dixon's claim that the prosecutor "misled the trial court" as to whether Deana had been raped finds no support in the record.

**B. Admissibility of the Rule 404(c) Evidence**

¶12 Although Dixon does not directly argue that the other acts evidence was improperly admitted, that argument underpins his misconduct allegations. Assuming that the argument is before us, we find it unavailing.

¶13 To admit evidence of another sexual offense, the trial court must find:

(A) The evidence is sufficient to permit the trier of fact to find that the defendant committed the other act.

(B) The commission of the other act provides a reasonable basis to infer that the defendant had a character trait giving rise to an aberrant sexual propensity to commit the crime charged.

(C) The evidentiary value of proof of the other act is not substantially outweighed by danger of unfair prejudice, confusion of issues, or other factors mentioned under Rule 403. . . .

5

Ariz. R. Evid. 404(c)(1).  As required by *State v. Aguilar*, 209 Ariz. 40, 49 ¶ 30, 97 P.3d 865, 874 (2004), the trial court made specific findings on each of the three Rule 404(c)(1) requirements before admitting the 1985 victim's testimony. Those findings are well supported by the record.

¶14    Dixon was convicted of the 1985 sexual assault.  As he conceded below, this conviction satisfies the requirement of Rule 404(c)(1)(A) that the evidence be sufficient to allow the trier of fact to conclude that the defendant committed the other act.

¶15    The evidence also provided the superior court a reasonable basis for concluding pursuant to Rule 404(c)(1)(B) that Dixon "has a character trait giving rise to an aberrant sexual propensity to commit the crime charged (sexual assault against non-consenting adult females)."  A psychologist and expert on sex offenders testified at the pre-trial hearing about important similarities between the 1985 rape and this case. Both victims were 21-year-old college students with brown hair, brown eyes, and similar height and weight.  In each case, a knife was used, the victim was restrained, and homicide was either threatened or occurred.  Both victims had apparently been re-dressed after the rape.  The expert opined that Dixon had an aberrant propensity to commit sexual assault.  Given the expert testimony and the substantial similarities between the two

6

crimes, the trial court's propensity determination was appropriate. *See* Ariz. R. Evid. 404(c)(1)(B), cmt. to 1997 Amend. (finding can be based on "expert testimony" or other facts).

¶16    Rule 404(c)(1)(C) requires that the evidentiary value of the other sexual conduct not be substantially outweighed by the danger of unfair prejudice. The trial judge did not abuse his discretion in concluding that Rule 404(c)(1)(C) was satisfied. In finding the other act not unduly remote, the judge noted that Dixon was out of custody for only about a year between the incidents. Sexual intercourse plainly occurred between Dixon and Deana, so the real question – at least for determining whether the predicate felony of rape occurred – was whether the sex was consensual. Dixon repeatedly intimated during trial that Deana had consented to sex. His 1985 sexual assault of another victim of the same age under strikingly similar circumstances had significant probative value in refuting that claim and establishing that a rape occurred in this case.

### C. Physical Restraints

¶17    At trial, Dixon was required to wear a stun belt and a leg brace under his clothing. Citing *Deck v. Missouri*, 544 U.S. 622 (2005), he argues that these restraints violated his right to a fair trial.

7

### 1. Relevant facts

¶18    When Dixon was tried, the Maricopa County Sheriff's Office required in-custody defendants who were dressed in civilian clothing to wear a leg brace and a stun belt while in court.  Before trial, Dixon moved only to "exclud[e] the leg brace," arguing that "[t]he wearing of the stun waist belt security device would allow [him] the freedom of expression before the jury that the State will enjoy."

¶19    The trial judge denied the motion, stating that "there are [jail] security policies for all in-custody defendants who dress out in civilian clothes" and refusing to "mak[e] an exception."  The court initially instructed Dixon to remain seated at counsel table in the jury's presence to avoid any possibility that the security devices would be visible to them.  Dixon instead sought to move about the courtroom during trial.  Expressing concern that the leg brace might cause Dixon to walk awkwardly, the judge said "if you want to make a motion to allow you to stand up or to approach and you waive your right to have the jury not see you walking in a stilted fashion, I'll consider it."

¶20    A week later, Dixon demanded use of a podium to question witnesses.  After Dixon acknowledged the risk that a jury might draw an inference from his movement, the judge acceded, stating "[t]he Court finds your decision to approach

8

the podium even though you have leg braces on and even though there is a possibility a jury could draw inferences is a knowing, voluntary, and intelligent one."

¶21     The judge nonetheless repeatedly took steps to prevent the jury from seeing the leg brace and stun belt.  The court arranged for Dixon to be standing at the podium when the jury entered the courtroom and reminded Dixon outside the jury's presence not to allow the jury to "see him walk."  The court instructed advisory counsel to approach for bench conferences and to show evidence to witnesses, and told Dixon not to approach the bench.  The court also told Dixon several times to not turn his back to the jury and bend over, as doing so might show the outline of the stun belt under Dixon's shirt.

### 2. Standard of review

¶22     Generally, "[m]atters of courtroom security are left to the discretion of the trial court."  *State v. Davolt*, 207 Ariz. 191, 211 ¶ 84, 84 P.3d 456, 476 (2004).  "We will uphold a trial court's decision concerning trial security measures when the decision is supported by the record."  *Id.*  However, "courts cannot routinely place defendants in shackles or other physical restraints *visible to the jury*" during a trial absent a case specific finding of a security concern.  *Deck*, 544 U.S. at 633

(emphasis added).[3]

**¶23** Dixon argues that the trial judge erred by not making the requisite finding. The State contends that this argument was waived because it was not made at trial. Dixon's pre-trial motion, however, sufficiently preserved the objection to the leg brace. *See State v. Anthony*, 218 Ariz. 439, 446 ¶ 38, 189 P.3d 366, 373 (2008).

**¶24** Dixon, however, never objected to the stun belt, and indeed suggested that the belt would not impair his opportunity to defend himself. Therefore, we review the stun belt issue for fundamental error. *Cf. State v. Mills*, 196 Ariz. 269, 272-73 ¶ 13, 995 P.2d 705, 708-09 (App. 1999) (issue waived when defendant initially questioned the use of shackles, but did not further object after switching to a concealed leg brace). Dixon must prove "both that fundamental error exists and that the error in his case caused him prejudice." *Henderson*, 210 Ariz. at 567 ¶ 20, 115 P.3d at 607.

### 3. Alleged *Deck* error

#### a. Case specific determination

**¶25** Before authorizing visible restraints, the trial court

---

[3] During the guilt phase, Deck wore "leg braces that apparently were not visible to the jury." 544 U.S. at 624. Deck did not challenge the leg braces on appeal. *Deck v. State*, 68 S.W.3d 418 (Mo. 2002). After his first sentence was set aside on unrelated grounds, *id.*, Deck wore handcuffs, leg irons, and a belly chain at his resentencing, *Deck*, 544 U.S. at 625.

10

must make a "case specific" determination reflecting "particular concerns, say, special security needs or escape risks, related to the defendant on trial." *Deck*, 544 U.S. at 633. "A decision based solely on a general jail policy of shackling defendants who wear jail garb or exercise their constitutional right to represent themselves is clearly not the kind of 'case specific' determination of 'particular concerns' that *Deck* requires." *State v. Gomez*, 211 Ariz. 494, 504 ¶ 49, 123 P.3d 1131, 1141 (2005) (footnote omitted). A trial judge "must have grounds for ordering restraints and should not simply defer to the prosecutor's request, a sheriff's department's policy, or security personnel's preference for the use of restraints. Rather, the judge should schedule a hearing at the defendant's request regarding the need for the restraints." *State v. Cruz*, 218 Ariz. 149, 168 ¶ 119, 181 P.3d 196, 215 (2008).

¶26  The trial judge here cited only jail policy and made no particularized finding of the need for security measures. We reiterate that judges should not simply defer to jail policy in ordering restraints of defendants. Rather, they should determine on a case-by-case basis whether security measures are required as to the particular defendant before them.

¶27  *Deck,* however, requires reversal only if restraints are "visible to the jury." *Deck*, 544 U.S. at 633; *Gomez*, 211 Ariz. at 504 ¶ 50, 123 P.3d at 1141; *see also Mills*, 196 Ariz.

11

at 272-73 ¶ 13, 995 P.2d at 708-09 (observing that "an unseen restraint could not have affected the presumption of innocence" (internal quotation marks omitted)). The central issue here is thus whether the restraints were visible.

### b. Leg brace

¶28     In *Gomez,* we rejected the State's argument that "leg irons" and "chains" were not visible, in large part because the trial judge offered to instruct the jury not to consider "the chains." 211 Ariz. at 504 ¶ 50, 123 P.3d at 1141. Unlike leg irons or shackles, however, leg braces and stun belts are typically worn under a defendant's clothes, as they were here.

¶29     Dixon cites no case holding that concealed leg braces violate the rule announced in *Deck*. Rather, the reported decisions correctly treat a leg brace worn under clothing as not visible in the absence of evidence to the contrary. *See, e.g., State v. Ninci*, 936 P.2d 1364, 1387 (Kan. 1997); *Zink v. State*, 278 S.W.3d 170, 186 (Mo. 2009). There is no evidence here that the jury either saw the brace or inferred that Dixon wore one. *Cf. State v. Wassenaar*, 215 Ariz. 565, 576 ¶ 44, 161 P.3d 608, 619 (App. 2007) ("While Defendant contends that several jurors did see the restraints at some unspecified time, he provided no admissible evidence to support his contention.").

### c. Stun belt

¶30     Because Dixon did not object to the stun belt below,

12

under fundamental error review he must show that it was visible to the jury. He has not met that burden. Although the trial judge, in warning Dixon not to bend over or turn his back to the jury, speculated that jurors might be able to see the outline of the belt beneath Dixon's clothing, Dixon has not established that the jury actually saw the belt or inferred its presence.

¶**31** Dixon cites *United States v. Durham*, 287 F.3d 1297, 1305 (11th Cir. 2002), which suggests that even a non-visible stun belt might violate the right to a fair trial. But the *Durham* court was primarily concerned about the defendant's argument that the threat of electric shock would inhibit his ability to communicate with counsel and participate in his defense. *Id.* at 1305-06. In contrast, Dixon did not object to the stun belt, expressly conceding that the non-visible belt would allow him to freely express himself in court. Under these circumstances, we find no fundamental error.

### d. Harmless error

¶**32** Even when visible restraints are improperly imposed, "[w]hen it is clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error, the error is harmless." *Hymon v. State*, 111 P.3d 1092, 1099 (Nev. 2005); *see also Deck*, 544 U.S. at 635 (noting applicability of harmless error doctrine). Given the DNA evidence implicating Dixon and the circumstances of the crime, this is such a case.

13

To conclude that Dixon had not committed the murder, the jury would have had to accept that Deana agreed, in the ninety minutes between the time she left the bar and was found dead, to have had sex with Dixon, apparently a complete stranger, and that after Dixon left her apartment, another person entered the apartment, strangled and stabbed her.

### D. Admission of Dr. Keen's Testimony

¶33    Dr. Heinz Karnitschnig, the Maricopa County medical examiner at the time of the murder, conducted the autopsy and prepared a report.  He did not testify at trial.  Instead, Dr. Philip Keen, who had more recently served as the medical examiner, testified based on his review of the autopsy report and photographs.  Neither the report nor the photographs were admitted into evidence.

¶34    Citing *Crawford v. Washington*, 541 U.S. 36 (2004), Dixon contends that Dr. Keen's testimony violated the Sixth Amendment's Confrontation Clause.  Dixon did not raise this argument below, so we review only for fundamental error.  *State v. Womble*, 225 Ariz. 91, 96 ¶ 10, 235 P.3d 244, 249 (2010).  We find no error, fundamental or otherwise.

¶35    Because the State does not argue to the contrary, we assume *arguendo* that the autopsy report itself was testimonial hearsay.  *But see United States v. De La Cruz*, 514 F.3d 121, 133 (1st Cir. 2008) (autopsy reports not testimonial hearsay under

14

*Crawford*); *United States v. Feliz*, 467 F.3d 227, 230 (2d Cir. 2006) (same). But that assumption avails Dixon not at all, because the autopsy report was not admitted into evidence. Rather, Dixon argues that Dr. Keen's testimony, which relied on the objective data in the report, was testimonial hearsay and thus violated the Confrontation Clause.

¶36 We have previously rejected this very argument. *See, e.g., State v. Snelling*, 225 Ariz. 182, 187 ¶ 21, 236 P.3d 409, 414 (2010); *State v. Smith*, 215 Ariz. 221, 228 ¶ 23, 159 P.3d 531, 538 (2007). Our cases teach that a testifying medical examiner may, consistent with the Confrontation Clause, rely on information in autopsy reports prepared by others as long as he forms his own conclusions. *Smith*, 215 Ariz. at 228 ¶ 23, 159 P.3d at 538; *State v. Gomez*, 226 Ariz. 165, 169-70 ¶ 22, 244 P.3d 1163, 1167-68 (2010) ("[A] medical examiner may offer an expert opinion based on review of reports and test results prepared by others, as long as the testifying expert does not simply act as a conduit for another non-testifying expert's opinion." (internal quotation marks omitted)); *cf*. Ariz. R. Evid. 703 (allowing testifying expert to rely on data not admitted into evidence).

¶37 Dr. Keen's testimony is indistinguishable from that upheld in our prior cases. The medical examiner offered his independent conclusions, relying on the factual findings of the

15

prior autopsy.  He neither parroted the report nor recited Dr. Karnitschnig's opinions.

### E. Denial of Hybrid Representation

¶38     When Dixon elected before trial to represent himself, the judge warned him that he would have "sole responsibility for his defense," including "examining and cross-examining witnesses."  Dixon nonetheless later requested that advisory counsel cross-examine the State's DNA experts.  Dixon sought, however, to continue to represent himself in all other respects. The trial court rejected "hybrid representation," stating that Dixon could elect to have counsel represent him at any point in the trial, but would not then be allowed to revert to self-representation.  We review the decision to deny hybrid representation for abuse of discretion.  *State v. Cornell*, 179 Ariz. 314, 325, 878 P.2d 1352, 1363 (1994).

¶39     There is no constitutional right to hybrid representation.  *Id.; see also State v. Roscoe*, 184 Ariz. 484, 498, 910 P.2d 635, 649 (1996) (characterizing hybrid representation as "disfavored").  In *Cornell*, the defendant sought to have advisory counsel cross-examine an expert.  179 Ariz. at 324-25, 878 P.2d at 1362-63.  As here, the trial judge gave the defendant the option of continuing to represent himself or having counsel take over completely.  *Id.* at 325, 878 P.2d at 1363.  The defendant chose self-representation and we upheld the

16

trial judge's order, noting that a request to resume *pro per* status during trial is "uniformly held" untimely, and that the denial of an untimely motion is not an abuse of discretion. *Id.* at 326, 878 P.2d at 1364. Similarly, the trial court here did not abuse its discretion in denying Dixon's motion for hybrid representation.

**F. Exclusion of Diary Evidence**

¶40    Dixon argues that the trial court erroneously excluded an entry from Deana's diary, which he claims stated that she had been sexually assaulted in Europe and would fight back if assaulted again. Dixon argues that the evidence should have been admitted under Arizona Rule of Evidence 803(3) to show that his sexual contact with her was consensual, as she likely would have forcibly resisted an assault.

¶41    Before trial, Dixon moved in limine to allow evidence that Deana was sexually active. This motion did not mention the diary or the trip to Europe. The court denied the motion, citing the rape shield law, A.R.S. § 13-1421(A) (2010).

¶42    At trial, after Dixon asked Deana's mother about the diary, the prosecutor sought to exclude evidence from the diary on relevance and hearsay grounds. Dixon responded that he wanted to elicit the information from Deana's boyfriend, and added, "I doubt seriously I will use the diary itself." The court ruled that Dixon could inquire about a witness's first-

17

hand knowledge of Deana's state of mind, but not about what was in the diary.

¶43     Dixon then claimed for the first time that the diary referred to a sexual assault in Europe, and the court stated that it had

> ruled under the rape shield law that her sexual activity or conduct is irrelevant, immaterial, and specifically excluded by statute unless you can fit it into one of the narrowly defined exceptions under the rule. You haven't given me a reason why this should now come in. Whether you call it an experience, a rape, a molestation, whether you call it consensual activity, whatever you call it, it's still sexual conduct under the statute.

The judge subsequently allowed Dixon to ask Deana's boyfriend if she carried a knife for personal protection.

¶44     The State contends that Dixon did not preserve any objection to exclusion of evidence from the diary because the record does not disclose what the document actually says. *See* Ariz. R. Evid. 103(a)(2) (requiring offer of proof to preserve objection to exclusion of evidence); *State v. Towery*, 186 Ariz. 168, 179, 920 P.2d 290, 301 (1996) (requiring, "[a]t a minimum, an offer of proof stating with reasonable specificity what the evidence would have shown"). We agree. Although Dixon and counsel discussed what they claimed was in the diary, no offer of proof was made, nor was the diary marked for identification. We thus have no basis for determining precisely what evidence was excluded.

18

¶45     Even had the issue been properly preserved for appeal, and assuming the contents of the diary were as Dixon claimed, however, we would find no abuse of discretion in the trial court's ruling.  *See State v. Villalobos*, 225 Ariz. 74, 82 ¶ 33, 235 P.3d 227, 235 (2010) (rulings excluding evidence are reviewed for abuse of discretion).  The alleged statements had minimal probative value.  Deana's state of mind years before the murder hardly establishes that she surely would or could have used a knife or other weapon to prevent this assault.

¶46     The diary evidence was also properly excluded under the rape shield law, which categorically prohibits evidence of "a victim's reputation for chastity," and allows evidence of "instances of the victim's prior sexual conduct" only in limited circumstances not applicable here.  A.R.S. § 13-1421(A).

¶47     Dixon argues that a prior sexual assault is not "prior sexual conduct" because a sexual assault is a crime of violence, and thus also does not reflect on the victim's "chastity."  The majority view, however, is that sexual assaults qualify as sexual conduct under rape shield laws.  *See Grant v. Demskie*, 75 F. Supp. 2d 201, 211-12 (S.D.N.Y. 1999) (collecting cases).  We agree; it would be anomalous to protect rape victims from questions about prior consensual conduct, but subject them to cross-examination about assaults.  *Cf. State v. Oliver*, 158 Ariz. 22, 27, 760 P.2d 1071, 1076 (1988) (applying common law

19

rape shield doctrine to child molestation victims).

## G. Denial of Motion for a Continuance

¶48       Dixon was arraigned in January 2003; the State filed a notice of intent to seek the death penalty in March of that year.  In July 2003, defense counsel suggested that it might take longer than usual to compile mitigation evidence because Dixon spent his early life on the Navajo reservation.  After counsel stated that the mitigation specialist would need "a year," the judge set the trial date for June 15, 2004.

¶49       Over the next few years, the court repeatedly granted defense requests to continue the trial.  In April 2004, the public defender estimated that if a new specialist were assigned, the mitigation investigation could be completed in five months.  The court granted a defense motion for a continuance and vacated the June trial date.  After the case was reassigned to a new specialist, the deadline for disclosure of mitigation evidence was accordingly extended to January 2005.  That deadline was not met, and after Dixon was granted permission to represent himself in March 2006, the trial date was set for October 18, 2006.  In September 2006, however, Dixon estimated that his mitigation evidence would not be ready for "nine months or a year."  The court continued the trial to June 25, 2007, "a date certain."

¶50       In May 2007, however, Dixon told the court his

mitigation was still not ready and sought another continuance. The trial was reset for August 2007. Two months later, Dixon requested another continuance. Although he expressed frustration, the judge reset the trial date for September 13, 2007. At a subsequent hearing, the trial date was moved back to November 13, 2007.

¶51    A week before trial was scheduled to begin, Dixon asked for a three-month continuance. The court denied the motion, noting in a minute entry that "[t]he defense mitigation work-up in this case has been ongoing for well over four years." Dixon claims that the court erred in denying this last continuance request.

¶52    At all times relevant to this case, Arizona Rule of Criminal Procedure 8.2(a)(4) provided that capital cases "shall be tried" within eighteen months of arraignment.[4] Continuances are governed by Rule 8.5(b), which states, in pertinent part:

> A continuance of any trial date shall be granted only upon a showing that extraordinary circumstances exist and that delay is indispensable to the interests of justice. A continuance may be granted only for so long as is necessary to serve the interests of justice. In ruling on a motion for continuance, the court shall consider the rights of the defendant and any victim to a speedy disposition of the case.

¶53    We review denials of continuances for "clear abuse of discretion," *State v. Schackart*, 190 Ariz. 238, 254, 947 P.2d

---

[4]    The rule now requires capital cases to be tried within twenty-four months of arraignment. Ariz. R. Crim. P. 8.2(a)(4).

21

315, 331 (1997), as the trial judge is "the only party in a position to determine whether there are 'extraordinary circumstances' warranting a continuance and whether 'delay is indispensable to the interests of justice,'" *State v. Hein*, 138 Ariz. 360, 368, 674 P.2d 1358, 1366 (1983).

¶54    We find no abuse of discretion here. Dixon was given more than four years to develop mitigation. The trial court found that the particular circumstances of this case, including Dixon's decision to represent himself and request a new mitigation expert, justified repeatedly continuing the original trial date. Indeed, the judge granted continuances even after cautioning Dixon that he had set "a date certain for trial."

¶55    Dixon's requests for continuances were premised on the alleged need to develop more mitigation evidence. However, in the penalty phase, Dixon presented virtually no evidence, even though advisory counsel advised the court that witnesses, both expert and percipient, were prepared to present substantial amounts of mitigation. In deciding to forego this available mitigation evidence, Dixon rejected the explicit advice of advisory counsel and the strong suggestions of the trial court. Instead, he chose to call only an expert to testify about his prison history.

¶56    In rejecting Dixon's final continuance request, the trial court appropriately considered not only Dixon's interests,

22

but also the rights of Deana's parents, the crime victims.  Rule 8.5(b) expressly directs the trial judge to consider the rights of victims, who, like the defendant, are entitled under our Constitution to a speedy disposition of criminal charges.  *See* Ariz. Const. art. 2, § 2.1(A)(10).  Deana's parents repeatedly asserted that right and the superior court did not abuse its discretion, after granting numerous continuances, in finally honoring their request that the trial proceed.

## H. Issues Raised to Avoid Federal Preclusion

¶57    Dixon raises twenty-one issues that he claims have been rejected in decisions by the Supreme Court of the United States or this Court.  The claims and the decisions he identifies as rejecting them are reprinted in the appendix to this opinion.

## I. Independent Review of the Death Sentence

¶58    Because the murder in this case occurred before August 1, 2002, we independently review the aggravation and mitigation findings, as well as the propriety of the death sentence.  A.R.S. § 13-755; 2002 Ariz. Sess. Laws, 5th Spec. Sess., ch. 1, § 7(B).  We "do not defer to the findings or decision of the jury, with respect to aggravation or mitigation, when determin[ing] the propriety of the death sentence."  *State v. Newell*, 212 Ariz. 389, 405 ¶ 82, 132 P.3d 833, 849 (2006) (alteration in original) (internal quotation marks omitted).  We

consider the quality and strength, not merely the quantity, of aggravating and mitigating circumstances. *Id.* If "the mitigation is sufficiently substantial to warrant leniency," we must impose a life sentence. *Id.* at ¶ 81 (internal quotation mark omitted).

### 1. Aggravation phase

¶59    The jury found two aggravating factors: a previous conviction of a crime for which life imprisonment or death was imposable, A.R.S. § 13-751(F)(1), and that the murder was especially cruel and heinous, A.R.S. § 13-751(F)(6). Both statutory factors were established beyond a reasonable doubt.

¶60    Dixon was convicted of seven crimes stemming from the 1985 rape of an NAU student and seven life sentences were imposed. Dixon thus correctly concedes that the A.R.S. § 13-751(F)(1) aggravator was proved.

¶61    A murder is especially cruel under A.R.S. § 13-751(F)(6) when the victim consciously "suffered physical pain or mental anguish during at least some portion of the crime and [] the defendant knew or should have known that the victim would suffer." *State v. Morris*, 215 Ariz. 324, 338 ¶ 61, 160 P.3d 203, 217 (2007). We find especial mental cruelty here. Deana surely must have suffered mental anguish while being raped, hit, and strangled, and Dixon should have known that the victim would suffer such anguish. *See State v. McCray*, 218 Ariz. 252, 259

24

¶¶ 32-33, 183 P.3d 503, 510 (2008) (finding mental anguish under similar facts); *see also State v. Gallardo*, 225 Ariz. 560, 565-66 ¶¶ 17-19, 242 P.3d 159, 164-65 (2010) (finding mental anguish when the defendant bound the victim and covered his head with a pillowcase before shooting him).[5]

### 2. Penalty phase

¶**62**      Dixon presented only one witness in the penalty phase – an expert who testified about Dixon's behavior in prison and the ability of the prison system to manage him.  The State presented a witness challenging that testimony.  But even assuming that the testimony of Dixon's expert was accurate, we give it little mitigating weight, as prisoners are expected to behave properly.  *See State v. Pandeli*, 215 Ariz. 514, 533 ¶ 82, 161 P.3d 557, 576 (2007).  After reviewing the entire record, we find that any mitigation established is not sufficiently substantial to call for leniency.  We therefore affirm the death sentence.

### III. CONCLUSION

¶**63**      For the foregoing reasons, we affirm Dixon's conviction and death sentence.

---

[5]    Especial mental cruelty alone establishes the A.R.S. § 13-751(F)(6) aggravator.  *Gallardo*, 225 Ariz. at 565 ¶ 16, 242 P.3d at 164.  Because we find mental cruelty, we need not determine whether the murder was also either especially physically cruel or heinous.  *Id*. at 265 ¶ 16, 242 P.3d at 164.

_____
Andrew D. Hurwitz, Vice Chief Justice


CONCURRING:


_____
Rebecca White Berch, Chief Justice


_____
W. Scott Bales, Justice


_____
A. John Pelander, Justice


_____
Robert M. Brutinel, Justice


**APPENDIX**


1. The fact-finder in capital cases must be able to consider all relevant mitigating evidence in deciding whether to give the death penalty. See *Woodson v. North Carolina*, 428 U.S. 280, 304 96 S. Ct. 2978 (1976). The trial court's failure to allow the jury to consider and give effect to all mitigating evidence in this case by limiting its consideration to that proven by a preponderance of the evidence is unconstitutional under the Eighth and Fourteenth Amendments. *State v. McGill*, 213 Ariz. 147, 161, ¶ 59, 140 P.3d 930, 944 (2006); see also *State v. Medina*, 193 Ariz. 504, 514–15, ¶ 43, 975 P.2d 94, 104–05 (1999).

2. Arizona's death penalty law unconstitutionally fails to require the cumulative consideration of multiple mitigating factors or require that the jury make specific findings as to each mitigating factor. *State v. Gulbrandson*, 184 Ariz. 46, 69, 906 P.2d 579, 602 (1995).

3. The (F)(6) "especially heinous, cruel or depraved" aggravating factor is unconstitutionally vague and overbroad because the jury does not have enough experience or guidance to determine when the aggravator is met. The finding of this aggravator by a jury violates the Eighth and Fourteenth Amendments because it does not sufficiently place limits on the discretion of the sentencing body, the jury, which has no "narrowing constructions" to draw from and give "substance" to the otherwise facially vague law. *State v. Cromwell*, 211 Ariz. 181, 188-90, ¶¶ 38–45, 119 P.3d 448, 455–57 (2005), and *State v. Anderson*, 210 Ariz. 327, 353, ¶ 114, 111 P.3d 369, 395 (2005).

4. The court also instructed the jury that they "must not be influenced by mere sympathy or by prejudice in determining these facts." These instructions limited the mitigation the jury could consider in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments and Article 2, §§ 1, 4, 15, 23, and 24 of the Arizona Constitution. *State v. Carreon*, 210 Ariz. 54, 70–71, ¶¶ 81–87, 107 P.3d 900, 916–17 (2005).

5. The death penalty is cruel and unusual under any circumstances and violates the Eighth and Fourteenth Amendments, and Article 2, § 15 of the Arizona Constitution. *Gregg v. Georgia*, 428 U.S. 153, 186–87, 96 S. Ct. 2909 (1976); *State v. Harrod*, 200 Ariz. 309, 320, ¶ 59, 26 P.3d 492, 503 (2001), *vacated on other grounds*, 536 U.S. 953, 122 S. Ct. 2653 (2002)(mem.); see also *Salazar*, 173 Ariz. at 411, 844 P.2d at 578.

6. The death penalty is irrational and arbitrarily imposed; it serves no purpose that is not adequately addressed by life in prison, in violation of the defendant's right to due process under the Fourteenth Amendment to the United States Constitution and Article 2, §§ 1 and 4 of the Arizona Constitution. *State v. Smith*, 203 Ariz. 75, 82, ¶¶ 35–36, 50 P.3d 825, 832 (2002), and *State v. Beaty*, 158 Ariz. 232, 247, 762 P.2d 519, 534 (1988).

7. There is no meaningful distinction between capital and non-capital cases, making each crime the product of an unconstitutionally vague statute. *Salazar*, 173 Ariz. at 411, 844 P.2d at 578.

8. Arizona's capital sentencing scheme unconstitutionally serves no deterrent purpose, exceeds any legitimate retributive aim, is without penological justification, and results in the gratuitous infliction of suffering. *Gregg*, 428 U.S. at 183.

9. The prosecutor's discretion to seek the death penalty has no standards and therefore violates the Eighth and Fourteenth Amendments, and Article 2, §§ 1, 4, and 15 of the Arizona Constitution. *State v. Sansing*, 200 Ariz. 347, 361 ¶ 46, 26 P.3d 1118, 1132 (2001), *vacated on other grounds*, 536 U.S. 954, 122 S. Ct. 2654 (mem.); see also *Cromwell*, 211 Ariz. at 181, §58, 119 P.3d at 459; *State v. Finch*, 202 Ariz. 410, 419, ¶ 50, 46 P.3d 421, 430 (2002).

10. Arizona's death penalty is applied so as to discriminate against poor, young, and male defendants, particularly when the victim is a Caucasian, in violation of Article 2, §§ 1, 4, and 13 of the Arizona Constitution. *Sansing*, 200 Ariz. at 361, ¶ 46, 26 P.3d at 1132; see also *State v. Stokley*, 182 Ariz. 505, 516, 898 P.2d 454, 465 (1995); *State v. West*, 176 Ariz. 432, 455, 862 P.2d 192, 215 (1993).

11. Proportionality review serves to identify which cases are above the "norm" of first degree murder, thus narrowing the class of defendants who are eligible for the death penalty. The absence of proportionality review of death sentences by Arizona courts denies capital defendants due process of law and equal protection and amounts to cruel and unusual punishment in violation of the Fifth, Eighth, and Fourteenth Amendments, and Article 2, § 15 of the Arizona Constitution. *Gulbrandson*, 184 Ariz. at 73, 906 P.2d at 606; see also *Salazar*, 173 Ariz. at 417, 844 P.2d at 584.

12. Arizona's capital sentencing scheme is unconstitutional because it does not require the State to prove the death penalty is appropriate or require the jury to find beyond a reasonable doubt that the aggravating circumstances outweigh the accumulated mitigating circumstances. Instead, Arizona's death penalty statute requires defendants to prove their

28

lives should be spared, in violation of the Fifth, Eighth, and Fourteenth Amendments, and Article 2, § 15 of the Arizona Constitution. *State v. Fulminante*, 161 Ariz. 237, 258, 778 P.2d 602, 623 (1988); see also *Carreon*, 210 Ariz. at 76 ¶ 122, 107 P.3d at 922.

13. Arizona's death penalty scheme does not sufficiently channel the sentencing jury's discretion. Aggravating circumstances should narrow the class of persons eligible for the death penalty and reasonably justify the imposition of a harsher penalty. A.R.S. § 13-703.01 is unconstitutional because it provides no objective standards to guide the jury in weighing the aggravating and mitigating circumstances and fails to provide principled means to distinguish between those who deserve to die or live. *State v. Johnson*, 212 Ariz. 425, 440, ¶69, 133 P.3d 735, 750 (2006). The broad scope of Arizona's aggravating factors encompasses nearly anyone involved in a murder, in violation of the Eighth and Fourteenth Amendments, and Article 2, § 15 of the Arizona Constitution. *State v. Pandeli*, 200 Ariz. 365, 382 ¶ 90, 26 P.3d 1136, 1153 (2001), *vacated on other grounds*, 536 U.S. 953, 122 S. Ct. 2654 (2002)(mem.); see also *State v. Greenway*, 170 Ariz. 155, 164, 823 P.2d 22, 31 (1991).

14. The jury instruction that required the jury to unanimously determine that the mitigating circumstances were "sufficiently substantial to call for leniency" violated the Eighth Amendment. *Ellison*, 213 Ariz. at 139, ¶¶ 101-102, 140 P.3d at 922.

15. The failure to instruct the jury that only murders that are "above the norm" may qualify for the death penalty violates the Sixth, Eighth and Fourteenth Amendments. *State v. Bocharski*, 218 Ariz. 476, 487-88, ¶¶ 47-50, 189 P.3d 403, 414-15 (2008).

16. The refusal to permit voir dire of prospective jurors regarding their views on specific aggravating and mitigating circumstances violates Appellant's rights under the Sixth and Fourteenth Amendments. *Johnson*, 212 Ariz. at 440, ¶¶ 29-35, 133 P.3d at 750.

17. Refusing to instruct the jury or permit the introduction of evidence and argument regarding residual doubt violated Appellant's rights under the

29

Sixth, Eighth and Fourteenth Amendments and Arizona law. *State v. Harrod*, 218 Ariz. 268, 278-79, ¶¶ 37-39, 183 P.3d 519, 529-30 (2008); *State v. Garza*, 216 Ariz. 56, 70 ¶ 67, 163 P.3d 1006, 1020 (2007).

18. Execution by lethal injection is cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments, and Article 2, § 15 of the Arizona Constitution. *State v. Van Adams*, 194 Ariz. 408, 422, ¶ 55, 984 P.2d 16, 30 (1999); *State v. Hinchey*, 181 Ariz. 307, 315, 890 P.2d 602, 610 (1995).

19. Arizona's current protocols and procedures for execution by lethal injection constitute cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments. *State v. Andriano*, 215 Ariz. 497, 510, ¶¶ 61-62, 161 P.3d 540, 553 (2007).

20. Arizona's death penalty scheme unconstitutionally requires imposition of the death penalty whenever at least one aggravating circumstance and no mitigating circumstances exist, in violation of the Eighth and Fourteenth Amendments, and Article 2, Section 15 of the Arizona Constitution. Arizona's death penalty law cannot constitutionally presume that death is the appropriate default sentence. *Walton v. Arizona*, 497 U.S. 639, 648, 110 S. Ct. 3047 (1990); *State v. Miles*, 186 Ariz. 10, 19, 918 P.2d 1028, 1037 (1996). Arizona's death statute creates an unconstitutional presumption of death and places an unconstitutional burden on Appellant to prove mitigation is "sufficiently substantial to call for leniency." *State v. Glassel*, 211 Ariz. 33, 52 ¶ 72, 116 P.3d 1193, 1212 (2005).

21. The failure to provide the jury with a special verdict on Appellant's proffered mitigation deprived him of his rights to not be subject to ex post facto legislation and right to meaningful appellate review. *State v. Roseberry*, 210 Ariz. 360, 373 74 & n. 12, 111 P.3d 402, 415 (2005).