NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

STATE OF ARIZONA, *Appellee,*

*v.*

DAVID A GONZALEZ, *Appellant.*

No. 1 CA-CR 23-0237

FILED 02-11-2025

Appeal from the Superior Court in Maricopa County
No.  CR2020-001873-001
The Honorable David O. Cunanan, Judge (Retired)

**AFFIRMED AS MODIFIED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Gracynthia Claw
*Counsel for Appellee*

The Law Office of Kyle T. Green, Mesa
By Kyle Green
*Counsel for Appellant*

---

**MEMORANDUM DECISION**

Presiding Judge Michael S. Catlett delivered the decision of the Court, in which Judge Jennifer M. Perkins and Vice Chief Judge Randall M. Howe joined.

---

**C A T L E T T**, Judge:

¶1        Counsel for David Gonzalez ("Gonzalez") filed an opening brief pursuant to *Anders v. California*, 386 U.S. 738 (1967), and *State v. Leon*, 104 Ariz. 297 (1969). After reviewing the record, we struck the opening brief and ordered briefing on whether any testimony at trial violated Gonzalez's rights under the Confrontation Clause and whether his separate sentences for premeditated murder and felony murder violated the Double Jeopardy Clause. We conclude Gonzalez has not shown that the State violated the Confrontation Clause, let alone in a manner giving rise to fundamental error. But because premeditated murder and felony murder are two ways of committing the same offense—first-degree murder—we merge Gonzalez's conviction for felony murder with his conviction for premeditated murder and vacate his separate sentence for felony murder.

**FACTS AND PROCEDURAL HISTORY**

¶2        This case involves a murder and kidnapping in a state prison. In June 2018, an inmate was found dead in the prison's restricted unit. The victim was serving a lengthy sentence for child molestation, an offense that places a "target" on the back of any inmate. A corrections officer found the victim lying unconscious in the unit's bathroom with a bed sheet loosely wrapped around his neck and tied to a railing. An investigator also located a belt in the bathroom. The investigator concluded the victim's injuries were not consistent with suicide by hanging from the bedsheet.

¶3        Initially, other inmates in the unit did not cooperate in the investigation. Gonzalez, however, told the investigator he saw two other inmates in the bathroom at the time of the murder. This led other inmates to request a second interview, where they disclosed that Gonzalez threatened them not to talk, called himself the "angel of death," and admitted to the murder. One inmate claimed he heard Gonzalez beat and strangle the victim to death.

¶4          Officers submitted various items for DNA analysis, including the bed sheet and belt found in the bathroom and Gonzalez's pants and shoes.  An analyst found a mixture of DNA on the bed sheet with a major component matching the DNA profiles of the victim and Gonzalez at five STR loci.  The analyst also found DNA on the belt that matched Gonzalez's profile at all twenty-three STR loci.  No DNA found on the belt, pants, or shoes matched the victim's profile.  A medical examiner performed an autopsy, concluding the victim died of ligature strangulation and blunt force trauma.  The medical examiner found abrasions on the victim's hands, like the ligature marks on his neck, and blunt force trauma injuries to his head and torso.  She also determined that the width of the belt appeared consistent with the width of the ligature marks on the victim's neck.

¶5          The State charged Gonzalez with premeditated murder, felony murder, and kidnapping.  At trial, the State called multiple witnesses, including a forensic scientist with the Arizona Department of Public Safety and a Maricopa County medical examiner.  But both were, at least in part, substitute witnesses for the individuals who originally completed the DNA report and medical examination.

¶6          The forensic scientist testified that one of her responsibilities includes "reviewing the reports" of her colleagues.  She testified she did not author the DNA report but reviewed the documentation and agreed with her colleague's results.  She explained her procedure for obtaining a DNA profile, matching the profile to an individual, and determining the statistical probability of the match.

¶7          The State asked about the process for obtaining the DNA analysis in this case and the forensic scientist explained the procedures her colleague completed.  DNA was obtained from a bed sheet, belt, pants, and shoes and compared to the victim and Gonzalez.  The forensic scientist explained that the bedsheet contained a mixture of DNA from "at least four individuals," but the "major component of this mixture [was] consistent with the combined DNA profiles of [the victim] and [Gonzalez] at five STR loci."  The DNA tested was only a "touch-type sample," meaning it was from skin cells and a "smaller amount" in comparison with DNA from bodily fluids.  The results of the remaining eighteen out of twenty-three loci were not enough to "exclude" Gonzalez as a contributor or "report out a result."  But the forensic scientist testified the report stated it was between 4.9 million to 780 million times "more likely" that the DNA was a mixture of the victim and Gonzalez, versus the victim and another individual.  DNA from blood on the belt, pants, and shoes matched Gonzalez at all twenty-three loci.

¶8         Gonzalez's attorney did not object to the forensic scientist's testimony but did cross examine her, highlighting what the DNA evidence did not show, including that the victim's DNA was not found on the belt, pants, or shoes.  Despite prior testimony that Gonzalez was seen with a scratch on his nose, the forensic scientist admitted that Gonzalez's DNA was not found under the victim's fingernails.  And during closing argument, Gonzalez's counsel argued that some of the DNA results showed Gonzalez did not commit the crimes.

¶9         A substitute medical examiner also testified.  The medical examiner used the autopsy report to share the victim's name, pinpoint when the autopsy occurred, and identify the two causes of death as blunt force trauma and strangulation.  The medical examiner testified that the author of the original report considered the victim's medical history, and the testifying medical examiner then described the "number of signs of strangulation documented."

¶10        The medical examiner testified about the physiological results of strangulation, including the injuries to the neck, imprints of the item used, and hemorrhages that show with "pinpoint red dots."  She also discussed photos taken of the victim during the exam, detailed the parts of the body shown in the images, identified specific injuries, and explained how the injury was evidence of strangulation.  The medical examiner identified "pinpoint red dots" on the victim's eyes, eyelids, forehead, and inside the mouth.  The State then asked whether there were any other injuries or signs of a struggle noted in the autopsy report.  The medical examiner responded that there were hemorrhages, scrapes on several fingers, and an abrasion on the victim's neck.  Gonzalez's attorney cross-examined the medical examiner but did not object to her testimony or question her on the examination procedures.

¶11        The jury found Gonzalez guilty on all three counts.  The superior court sentenced Gonzalez to natural life in prison for pre-meditated murder, natural life in prison for felony murder, and five years in prison for kidnapping, all to be served concurrently.  Gonzalez did not object to being sentenced for both premeditated murder and felony murder.

¶12        Gonzalez timely appealed.  We have jurisdiction.  A.R.S. §§ 13-4031; 13-4033(A)(1).

**DISCUSSION**

I. **Fundamental Error**

¶13        Preliminarily, the State argues Gonzalez's failure to object on Confrontation Clause grounds "warrants dismissal of [those] claims for waiver." We disagree. In a criminal case, the failure of a defendant to object to trial testimony on Confrontation Clause grounds results in fundamental error review on appeal. *See State v. Fordson*, ___ Ariz. ___, 555 P.3d 52, 54 ¶ 1 (App. 2024) ("We hold that a defendant must assert his or her Confrontation Clause rights to preserve the issue for anything but fundamental error review on appeal.").

¶14        To succeed under fundamental error review, an appellant must first establish there was an error at trial. *State v. Escalante*, 245 Ariz. 135, 142 ¶ 21 (2018). Next, an appellant must show that the error was fundamental because it (1) went to the foundation of the case, (2) took away an essential right necessary to demonstrate a viable defense or rebut the prosecution's case, or (3) was so egregious that he could not possibly have received a fair trial. *Id.* at 141–42 ¶¶ 18–21. Finally, if the appellant relies on prong one or two, there must be a separate showing of prejudice. *Id.* at 142 ¶ 21. "The [appellant] bears the burden of persuasion at each step." *Id.*

II. **Confrontation Clause**

¶15        Gonzalez argues that allowing two substitute experts to testify violated his Confrontation Clause right. The Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him[.]" U.S. Const. amend. VI. The Clause "prohibit[s] the introduction of testimonial statements by a nontestifying witness, unless the witness is 'unavailable to testify, and the defendant had had a prior opportunity for cross-examination.'" *State v. Aragon*, ___ Ariz. ___ , 555 P.3d 571, 573 ¶ 10 (App. 2024) (quoting *Crawford v. Washington*, 541 U.S. 36, 54 (2004)).

A. **Forensic Scientist Testimony**

¶16        Gonzalez argues the State's use of a substitute forensic scientist deprived him of the right to cross-examine the individual who originally tested for DNA in this case. "To implicate the Confrontation Clause, a statement must be hearsay ('for the truth') and it must be testimonial[.]" *Smith v. Arizona*, 602 U.S. 779, 800 (2024); *see also Aragon*, 555 P.3d at 573 ("First, the clause applies only to testimonial statements. Second, it applies only to hearsay.") (citation omitted). "A court must

therefore identify the out-of-court statement introduced, and must determine, given all the 'relevant circumstances,' the principal reason it was made." *Smith*, 602 U.S. at 800–01.

¶17　　　　Gonzalez broadly argues that the DNA testimony allowed corroboration of other witnesses' testimony without cross-examination. But the other witnesses Gonzalez refers to are prisoners who testified, not the original DNA analyst. And Gonzalez's brief does not pinpoint specific statements the forensic scientist made that were problematic. *See Smith*, 602 U.S. at 801 (advising that, when analyzing Confrontation Clause challenges, "the court will need to consider exactly which of the [testifying analyst's] statements are at issue."). Because Gonzalez does not specifically identify problematic testimony from the forensic scientist, he also does not argue how any such statements were testimonial hearsay.

¶18　　　　Additionally, the superior court record is not sufficiently developed to determine what part of the forensic scientist's testimony was based on personal knowledge and what part was gleaned only through the original DNA analyst's report. While the forensic scientist testified that one of her responsibilities included "reviewing" reports authored by her colleagues, and at times she read from the original analyst's report, the record is unclear about which potions of her testimony were based on personal knowledge and which were hearsay. For example, it is unclear whether the testifying scientist had any role in conducting or supervising the DNA testing and analysis in this case or in reviewing or approving the resulting report. *See State v. Gomez*, 226 Ariz. 165, 169 ¶ 21 (2010) ("Gomez correctly does not argue that the analyst's testimony about her role in the testing process, the laboratory's procedures, and the qualifications of the technicians was hearsay. This testimony was based on the analyst's personal knowledge."). Having not identified, with reference to a developed record, any specific statements by the forensic scientist constituting testimonial hearsay, Gonzalez has not shown error, let alone fundamental error causing prejudice.

### B.　　Medical Examiner Testimony

¶19　　　　Gonzalez argues the autopsy report was testimonial hearsay because the medical examiner who testified "did not form her own opinions." "A document created solely for an 'evidentiary purpose,' . . . made in aid of a police investigation, ranks as testimonial." *Fordson*, 555 at 56 ¶ 15 (quoting *Bullcoming v. New Mexico*, 564 U.S. 647, 664 (2011)).

¶20 Gonzalez's argument that admission of the autopsy report violated the Confrontation Clause falters on at least two grounds. First, the autopsy report, on its own, was not testimonial. When a person dies in prison, Arizona law requires the county medical examiner to direct a death investigation. *See* A.R.S. § 11–594(A)(2). When an autopsy is performed as part of that investigation, the medical examiner must provide "a full record or report of the facts developed by the autopsy in the findings of the person performing the autopsy[.]" A.R.S. § 11–597(E). Because the autopsy report here was made in aid of the medical examiner's death investigation, which would have occurred regardless of the victim's cause of death and whether charges were ever brought relating to that death, the report was not created "solely for an evidentiary purpose." The report was not testimonial. *Aragon*, 555 P.3d at 574 ¶ 15; *State v. King*, 213 Ariz. 632, ¶ 25 (App. 2006) (concluding that MVD records were not testimonial because they "are required to be kept by statute and exist independently of any criminal prosecution").

¶21 Second, the medical examiner did not merely rely on the autopsy report's findings during her testimony. She independently walked through the photographs from the autopsy, explaining the injuries, body parts, and causes of the injuries depicted in the images. *See State v. Medina*, 232 Ariz. 391, 407 ¶ 64 (2013) ("The portions of [the substitute doctor's] testimony concerning his independent conclusions also did not violate the Confrontation Clause[.]"); *State v. Dixon*, 226 Ariz. 545, 553 ¶ 36 (2011) ("Our cases teach that a testifying medical examiner may, consistent with the Confrontation Clause, rely on information in autopsy reports prepared by others as long as [s]he forms [her] own conclusions."). And, like with the forensic scientist, Gonzalez fails to identify any specific statement the medical examiner made that might constitute testimonial hearsay. *See Smith*, 602 U.S. at 801. Gonzalez has not shown that allowing the medical examiner's testimony was fundamental error resulting in prejudice.

### III. Double Jeopardy

¶22 Gonzalez argues that being convicted and sentenced twice for the same offense violates Double Jeopardy. "The Double Jeopardy Clauses of the United States and Arizona Constitutions protect criminal defendants from multiple convictions and punishments for the same offense." *State v. Ortega*, 220 Ariz. 320, 323 ¶ 9 (App. 2008); *see also* U.S. Const. amend. V; Ariz. Const. art. 2, § 10. We review whether a conviction violates the Double Jeopardy Clause *de novo*. *State v. Powers*, 200 Ariz. 123, 125 ¶ 5 (App. 2001).

¶23　　　　The State concedes fundamental error and we agree. Premeditated murder is defined as "[i]ntending or knowing that the person's conduct will cause death, the person causes the death of another person . . . with premeditation[.]"　A.R.S. § 13-1105(A)(1).　Felony murder occurs when an individual "causes the death of any person" while committing any enumerated crime, including kidnapping.　A.R.S. § 13-1105(A)(2).　While premeditated murder and felony murder have different elements, that "does not make them different crimes, rather they are simply two forms of first degree murder."　*State v. Tucker*, 205 Ariz. 157, 167 ¶ 50 (2003).　Our supreme court has repeatedly stated that "[t]here is only a single crime of first degree murder" and "[f]elony murder is not a separate offense" from pre-meditated murder.　*Id.*; *see also State v. Encinas*, 132 Ariz. 493, 496 (1982) ("[F]irst degree murder is only one crime regardless whether it occurs as a premeditated murder or a felony murder.").　We, therefore, merge Gonzalez's conviction for felony murder with his conviction for premeditated murder and vacate his separate life sentence for felony murder. We affirm Gonzalez's other convictions and sentences. *See Merlina v. Jejna*, 208 Ariz. 1, 4 ¶ 14 n.4 (App. 2004); *see also* A.R.S. § 13-4037(A).

## CONCLUSION

¶24　　　　We merge Gonzalez's conviction for felony murder with his conviction for premeditated murder, vacate his separate life sentence for felony murder, and affirm in all other respects.

